Mary Friesen, Gerald J. Friesen, Arlie J. Friesen, Jimmy D. Friesen and Jo Etta Mary Wall, *Appellants*, v. Chicago, Rock Island and Pacific Railroad, a corporation, and R. J. Scarbrough, *Appellees*.

(524 P. 2d 1141)

Opinion filed July 17, 1974.

*Bradley Post,* of Michaud, Cranmer, Syrios and Post, of Wichita, argued the cause, and *Orval L. Fisher,* of the same firm, and *E. Keith Beard,* of Wilson and Beard, of Meade, were with him on the brief for the appellants.

*Mark L. Bennett, Jr.,* of Davis and Bennett, of Topeka, argued the cause, and *James Williams,* of Williams, Larson, Voss and Strobel, of Dodge City, was with him on the brief for the appellees.

The opinion of the court was delivered by

OWSLEY, J.: This litigation arose out of a railroad crossing accident on January 6, 1971, at the north edge of Meade, Kansas, resulting in the death of Jonas W. Friesen, the driver of a pickup truck involved in the accident. The case was submitted to a jury on the issue of the negligence of the defendant railroad and its engineer, R. J. Scarbrough. The jury returned a verdict for the defendants. Plaintiffs appeal, claiming prejudicial error of the trial court in the giving and refusing of instructions and in the exclusion of testimony; in sustaining a motion at the close of all the evidence removing the issue of gross and wanton negligence of the defendant railroad from the case before submission to the jury; and in failing and refusing to instruct on plaintiffs' theory of last clear chance.

Prior to the collision, there was a ten-inch snow at Meade on January 3, 1971, and the entire area was covered with snow. All of the highways and roadways in the vicinity were covered with packed snow and ice, including Highway K-23 where it crossed the Rock Island tracks on the north edge of Meade.

At the location of the accident there were three sets of tracks. The northernmost track was a siding track; thirty-two feet south of

this track and parallel to it was the Rock Island main line; and south of the main line was another siding track. The three sets of tracks ran east and west and the highway ran north and south. A short distance north of the north siding track and west of the highway was an asphalt driveway thirty-eight and one-half feet in width, which ran west from the highway approximately 189 feet to the Co-op elevator. The south edge of the drive was fifty-two and one-half feet from the main line and the north edge of the driveway was approximately ninety-one feet from the main line. The Western Concrete Ready Mix plant was located on the east side of the highway, opposite this driveway. On the morning of January 6, 1971, employees of this plant, the Co-op elevator, and the City of Meade had been back and forth across the crossing and, although there was snow on the crossing as there was over the entire area, they experienced no particular difficulty in crossing the tracks.

Prior to the collision which resulted in Friesen's death, Rock Island freight train 2/91 was approaching from the east with Engineer R. J. Scarbrough at the controls, seated on the right-hand or north side of the engine. The train consisted of six diesel engines, 85 cars and 4,200 tons, and approached the crossing at 54-57 miles per hour. As the train approached the crossing, the defendant Scarbrough commenced sounding the train's whistle and engine bell when it was 2,500 feet east of the crossing. In addition, the lead engine's headlight was on although it was daylight.

The crossing was protected by flashing lights and bells, which were operating prior to, at the time of, and subsequent to the collision. They were located on the northwest corner of the crossing between the tracks and the Co-op drive, forty-one feet north of the north rail of the main line and twenty-five feet from the center line of K-23 highway, and also on the southeast corner of the crossing. Each set of lights consisted of four bulbs adjacent to each other, and equipped with a red lens; and the four lights, two pointing north and two pointing south, operated alternately and "flashing." The two signals were identical and the flashing of both sets of lights could be observed by the driver of a vehicle as he approached from either the north or the south. These lights and the bells attached thereto were activated when the front wheels of a train approaching from the east reached a point 3,023 feet east of the crossing and the bells were of sufficient intensity they could be heard two blocks away.

As a traveler approached the crossing from the north on K-23 highway, he had an unobstructed view to the east, of approximately 1,000 feet when he was in the southbound lane and fifty feet north of the main line; and when he reached the north siding track thirty-two feet from the main line he had an unobstructed view to the east, of one-half to three-fourths of a mile.

The evidence established that when the approaching train was six hundred feet east of K-23, Friesen, who had been at the Co-op for a load of feed, was driving his pickup east along the Co-op driveway. When the pickup was seen by the engineer, it was still back in the driveway about one hundred feet. As Friesen drove east along the driveway, he passed the nearby flashing signal located north of the tracks and west of K-23. He did not stop for the stop sign and proceeded on to K-23, turned south and apparently ignored the flashing lights, bells and train whistle, continuing south at 10-15 miles per hour. When the Friesen vehicle reached the north siding track, the train had reached a point three hundred feet east of the crossing; and as the pickup started across the siding track the engineer for the first time realized the pickup was not going to stop. In an attempt to get the driver's attention, the engineer then changed his regular pattern of blowing the whistle for the crossing and commenced a series of short blasts. At the same time, he placed the train in full emergency, which means that all brakes on the diesel engine as well as the cars were fully applied, the automatic sanders were activated, and all power to the engines was shut off. Friesen continued in a southerly direction at a slow rate of speed and it appeared that he looked to the west. He did not look to the east until just before impact, at which time his vehicle appeared to stop, fouling the main line track; he looked up at the train, threw up his hands, then appeared to be attempting to turn his pickup to the west. As a result of this collision, Friesen's vehicle was carried 2,280 feet west of the crossing, where the train came to rest, and he appeared to have been killed instantly upon impact.

Arlie Johnston, sheriff of Meade County, investigated or assisted in the investigation. He testified he saw where both back wheels of the Friesen vehicle had been sitting and spinning at the point of impact where the train hit the pickup. He also testified that a vehicle traveling at ten miles per hour or less couldn't cross the tracks without stalling.

John E. Murphy, Kansas Highway Patrol trooper, testified he talked with defendant Scarbrough who told him the collision occurred at a time when the train was going 52-53 miles an hour; that the engineer saw the pickup approach the crossing and it looked as if it stalled or hung up on the roadway. He further testified he examined the scene and confirmed what the engineer had told him about the back wheels spinning at a rapid rate and smoking or burning into the snow and ice. He stated there was a hook or a dip right by the track or next to the track and that in his opinion a vehicle moving ten miles an hour or less "could have possibly been stalled or could have stalled due to that area."

Joe Wetmore testified that he had occasion to travel over this crossing on January 6, 1971, and he observed the ditches alongside the tracks which were quite deep and quite wide. He described the ditches as being five to six inches deep and about one foot wide. He also stated that a half-ton pickup without four-wheel drive traveling at less than ten miles an hour could be stopped or stalled on the tracks as a result of the condition of the tracks.

The evidence also disclosed that flashing lights which were in operation had been maintained for a number of years and were the same type of signals which were in operation at the time of three previous collisions at the crossing.

Plaintiffs stressed in oral argument and in their brief the issue of the railroad's gross and wanton negligence. They claim the trial court erred in sustaining defendants' motion for a directed verdict on the issue of gross and wanton negligence at the close of all the evidence, and erred in its subsequent refusal to instruct the jury as to gross and wanton negligence. Although plaintiffs present their argument under two separate headings, the points raised will be treated together inasmuch as the rules of law apply equally to both points. The issue applies only to the defendant railroad, since the defendant R. J. Scarbrough was charged only with acts of negligence.

In the pretrial order it was shown that the plaintiffs contended certain acts or omissions in violation of duty on the part of the railroad were not only acts of negligence, but were also acts of gross and wanton negligence. The acts charged against the railroad were as follows:

"A. Failure to install crossarms (automatic gates) or maintain a watchman at the involved crossing under the surrounding facts and circumstances.

"B. Failure to expedite installation of crossarms or take appropriate safety measures before installation thereof.

"C. Causing or permitting unusually dangerous and hazardous conditions to exist at the involved crossing under the circumstances.

"D. Causing or permitting the involved crossing to become rough, ungraded and uneven with tracks at uneven elevations, creating a dangerous and hazardous condition for Joe Friesen and other members of the public, contrary to K. S. A. 66-227.

"E. Causing or permitting visual obstructions to be erected near the involved crossing resulting in restricted sight distance for approaching vehicles.

"F. Failure to provide flagmen after notice of danger and before construction of gates.

"G. Failure to clear snow from the involved crossing.

"H. Failure to order trains to be operated at appropriate reduced speeds under the circumstances existing.

"I. Failure to order and obtain compliance with defendant's operating rules.

"J. Failure to do any act or thing to make the crossing safe for use after knowledge of danger and hazards by reason of previous collisions and engineering surveys."

The importance to the plaintiffs of submitting the issue of gross and wanton negligence involves the contributory negligence of the deceased. Simply stated, if the defendants were guilty of negligence and the deceased was guilty of contributory negligence, each of the defendants was absolved from liability; while if the railroad was guilty of gross and wanton negligence, the contributory negligence of the deceased would not be a defense. (*Frazier v. Cities Service Oil Co.,* 159 Kan. 655, 157 P. 2d 822; *Long v. Foley,* 180 Kan. 83, 299 P. 2d 63.)

Plaintiffs argue the claim of wantonness against the defendant railroad was not based solely on the conduct of the engineer or because of the failure of maintenance during and following the snowstorm, but because of the absence of cantilever lights and crossarms, with notice that previous accidents had occurred at the crossing. Plaintiffs claim that the admitted knowledge of the defendant railroad many months before this collision, of a study by the engineering department of the Kansas Highway Commission, had disclosed that the intersection was in need of more protection; that there had been recent accidents at this location, one of which involved a fatality; and that the crossing required cantilever lights and crossarms to afford adequate protection to the public. Plaintiffs point out the evidence showed the recommendation of the engineering study had been accepted and agreed to by the railroad early in the previous year. Thus, the railroad knowing of the danger and appreciating the risk to the public, was satisfied to sit back during the time required to secure financing.

of ninety percent of the cost of needed improvement from the federal government; and in the meantime issued no slow orders, did nothing to slow its trains through the hazardous crossing, nor to post a flagman or give warning to the public of danger. Plaintiffs further contend the conduct of the defendant railroad was even more reprehensible because of its knowledge and maintenance of its right-of-way with numerous obstructions to the public and, during and after the snowstorm, failing to maintain the crossing in such a way as to prevent the very thing that happened in this case—a traveler becoming entrapped at the location of the tracks, caused by the railroad's failure to maintain the crossing by the removal of ice and snow.

Plaintiffs cite *Bailey v. Resner*, 168 Kan. 439, 214 P. 2d 323, involving the "guest statute," and direct our attention to the following definition of wantonness contained therein:

". . . [A] wanton act is something more than ordinary negligence, and yet it is something less than willful injury; to constitute wantonness, the act must indicate a realization of the imminence of danger and a reckless disregard and complete indifference and unconcern for the probable consequences of the wrongful act. It might be said to include a willful, purposeful, intentional act, but not necessarily so; it is sufficient if it indicates a reckless disregard for the rights of others with a total indifference to the consequences, although a catastrophe might be the natural result." (p. 442.)

Plaintiffs also cite *Muhn v. Schell*, 196 Kan. 713, 413 P. 2d 997, where the court said:

"Perhaps the mental attitude of the wrongdoer, rather than particular negligent acts, tends to establish wantonness. It would appear that at least two attitudes must be present. There must be realization of imminent danger and reckless disregard, indifference and unconcern for probable consequences. Therefore, whether the necessary elements are present to constitute wantonness must of necessity depend on the facts and circumstances of each particular case." (p. 716.)

Plaintiffs note also the definition of wantonness found in *Frazier v. Cities Service Oil Co.*, supra, wherein the court stated:

"From the above cases and those cited therein, it may be concluded that as to injuries inflicted, wanton conduct or wantonness comes between negligence on the one hand and willful or malicious misconduct on the other; that it is more than negligence and less than willfulness, and to constitute wantonness the acts complained of must show not simply lack of due care, but that the actor must be deemed to have realized the imminence of injury to others from his acts and to have refrained from taking steps to prevent the injury because indifferent to whether it occurred or not. Stated in another way, if the actor has

reason to believe his act may injure another, and does it being indifferent to whether or not it injures, he is guilty of wanton conduct." (p. 666.)

Each case must be determined on the particular facts and circumstances involved, and in determining whether a submissible case exists all factual questions and all inferences reasonably to be drawn from the evidence must be resolved in favor of the plaintiffs where reasonable minds might reach different conclusions therefrom. (*Evangelist v. Bellern Research Corporation,* 199 Kan. 638, 433 P. 2d 380.)

As stated in *Muhn v. Schell,* supra, it is the mental attitude of the wrongdoer, rather than particular negligent acts, that tends to establish wantonness. First, the rule stated in *Muhn* requires there must exist a realization of imminent danger, and we must consider whether the railroad through its agents, servants and employees had a realization of imminent danger. The presence of a railroad crossing in itself creates danger, but it is difficult to reason that the railroad at this particular time and place realized a collision between the train and a motor vehicle was about to take place. We must be aware that the trial court submitted the issue of negligence of the railroad to the jury, placing the issue of due care in the hands of the jury. Although realization of imminent danger may be involved in the issue of due care, one may be found guilty of failing to exercise due care without having a realization of imminent danger. We believe it can be safely stated that there are many railroad crossings in this state which could be upgraded and as a result lessen the chances of accidents. We cannot conclude therefrom that a railroad should have a realization of imminent danger at all crossings which are in need of upgrading.

The rule also requires a "reckless disregard, indifference and unconcern for probable consequences." We believe it is sound reasoning that a token effort to prevent a collision would not avoid liability under this phrase, while definite acts which materially lessen the chances of a collision would avoid liability. An examination of the facts in this regard reveals several acts of the railroad which were aimed at preventing a collision: (1) The railroad installed additional warning devices at the crossing, to wit: flashing lights and bells in addition to the crossbucks required by statute; (2) it was cooperating fully with the State Highway Commission in further upgrading of the crossing protection, subject to approval by the Bureau of Public Roads; (3) the engineer was maintaining a

proper lookout as he approached the crossing; (4) the whistle on the engine was sounded for the crossing; (5) the engine bell was sounded for the crossing; (6) the headlight on the engine was burning even though it was daylight, in order to make the engine more visible; and (7) the flashing lights and bells were operating.

It cannot be disputed that each of the enumerated acts of the railroad were aimed at preventing a collision at this particular crossing and constituted a material effort on its part to prevent a collision. Perhaps the railroad could have done more and perhaps its failure to do more could have supported a jury finding of negligence. This, however, is not the issue with which we are concerned. Wantonness requires a mental attitude of indifference and unconcern and the acts of the railroad in this case disclosed a mental attitude of attempting to prevent a collision. What degree of negligence the law considers equivalent to a wanton act is as hard to define as negligence itself, and is so dependent upon the particular circumstances of each case as not to be susceptible of a general statement. (*Mathes v. Robinson,* 205 Kan. 402, 469 P. 2d 259.) After a careful examination of the facts and circumstances in this case we must conclude as a matter of law that the acts of the railroad do not constitute wantonness. Thus, the trial court did not err in sustaining defendant's motion for a directed verdict on the issue of wantonness and in failing to instruct on wantonness.

Plaintiffs claim the trial court erred in excluding testimony offered and proffered from the deposition of Ralph W. Carroll, engineer for the Kansas Highway Commission, and in excluding plaintiffs' exhibits 1, 2, 3, 4, 5, 11, 19 and 20. We are unable to locate in the record the testimony of Ralph W. Carroll which was excluded. Plaintiffs refer to pages in the deposition, but the record does not carry the pagination of the deposition. Since plaintiffs fail to identify the rejected testimony and to state reasons for their claim of error we cannot review. The rejected exhibits have reference to letters and reports pertaining to the initiation and carrying out of the engineering study and the agreement to provide the needed protection at the grade crossing involved. The letters and reports were part of the records of the Kansas Highway Commission. Plaintiffs maintain they were admissible under exceptions (*m*) and (*o*) to the hearsay rule as set forth in K. S. A. 60-460, which provides:

"(*m*) *Business entries and the like.* Writings offered as memoranda or records of acts, conditions or events to prove the facts stated therein, if the

judge finds that they were made in the regular course of a business at or about the time of the act, condition or event recorded, and that the sources of information from which made and the method and circumstances of their preparation were such as to indicate their trustworthiness;

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *

"(*o*) *Content of official record.* Subject to section 60-461, (1) if meeting the requirements of authentication under section 60-465, to prove the content of the record, a writing purporting to be a copy of an official record or of an entry therein, (2) to prove the absence of a record in a specified office, a writing made by the official custodian of the official records of the office, reciting diligent search and failure to find such record;"

The trial court rejected the exhibits for the reason the letters and reports were not communicated to the defendant railroad. Conversely, letters, reports and agreements relating to the same subject were admitted when it was shown they were directed to the defendant railroad or the railroad had knowledge of their contents.

We cannot read into exceptions (*m*) and (*o*) a requirement that the opposing party must have knowledge of the exhibits before they become admissible. Rejection of the documents on the sole ground the opposing party had no knowledge of the contents of the documents must be disapproved.

Plaintiffs were attempting to prove the Meade crossing protection needed upgrading. We have examined the admitted exhibits with reference to this subject and find these exhibits clearly make this showing. Plaintiffs were able to prove what they wanted to prove. We cannot find the trial court erred under these circumstances. We said in *Thompson v. Norman,* 198 Kan. 436, 424 P. 2d 593:

"Error may not be predicated upon the exclusion of evidence which is merely cumulative and does not add materially to the weight or clarity of that already received." (Syl. ¶ 2.)

Plaintiffs claim the trial court erred in failing and refusing to instruct on the theory of last clear chance and in failing to give plaintiffs' requested instruction No. 17. Requested instruction No. 17 invoked the doctrine of last clear chance generally in accord with the essential elements of the doctrine; *i. e.,* (1) That plaintiff by his own negligence placed himself in a position of danger; (2) that plaintiff's negligence had ceased; (3) that defendant seeing plaintiff in a position of danger, or by the exercise of due care should have seen plaintiff in such position, by exercising due care on his part had a clear chance to avoid injuring plaintiff; (4) that defendant failed to exercise such due care; and (5) as a result of

such failure on defendant's part, plaintiff was injured. (*Sander v. Union Pacific Rld. Co.,* 205 Kan. 592, 470 P. 2d 748; *Gibbs v. Mikesell,* 183 Kan. 123, 325 P. 2d 359.) It is difficult to apply the doctrine of last clear chance to a collision between a moving train and a moving vehicle. Normally, by the time a train crew discovers an approaching vehicle is not going to stop and yield the right-of-way the train is too close to the crossing to stop before striking the vehicle. This is plainly what happened in this case. The engineer testified as follows:

He first observed the Friesen vehicle when the vehicle was at a point in the Co-op driveway one hundred feet west of K-23 Highway and the freight train was six hundred feet east of said highway. The train consisted of six diesel engines of eighty-five cars and 4,200 tons. It was traveling at 54-57 miles per hour. When the train reached a point three hundred feet east of the crossing, he first realized Friesen was not going to yield the right-of-way to the train. At this time the Friesen vehicle was coming over the siding track some 30-32 feet north of the main line track. As soon as the train crew realized Friesen was not going to stop, the train was put in full emergency, all brakes were applied, and the power to the engine cut off. There was nothing more which could be done to bring the train to a stop any faster than what was in fact done. Following this emergency application of the braking system the train came to a stop 2,280 feet west of the crossing in question.

It was established that it took 2,580 feet in which to stop a train of that weight moving at that speed under conditions as they existed on the day of this collision.

The Co-op driveway on which Friesen was first observed led to the highway about one hundred feet north of the main line track. A constant observation of the Friesen vehicle could not have disclosed it was not going to stop before crossing the main track until it turned to the right onto the highway. Even if the train crew was put on notice that the Friesen vehicle was not going to stop at that time there was nothing the train crew could have done to avoid striking the Friesen vehicle. Assuming Friesen was negligent and that when he stalled on the tracks his negligence ceased, there is no factual basis in the record supporting the essential element of this doctrine that the train crew had a last clear chance to avoid striking the Friesen vehicle. We conclude the trial court properly rejected plaintiffs' requested instruction No. 17.

Affirmed.