Kelly THOMPSON, Appellee,

v.

Jack BOHLKEN, Defendant,

Daniel Long and Travelers Insurance Companies, Appellants.

No. 64595.

Supreme Court of Iowa.

Nov. 25, 1981.

502

Dennis M. Gray, of Peters Law Firm, Council Bluffs, for appellant Long.

Emmet Tinley, of Stuart, Tinley, Peters, Thorn, Smits & Sens, Council Bluffs, for appellant Travelers Ins. Companies.

Robert F. Leonard, of Leonard & Johnson, Sidney, for appellee.

LARSON, Justice.

Kelly Thompson, an employee of Farmaster Products, a manufacturing company in Shenandoah, lost the fingers of his left hand while operating a press for his employer. He sought damages against two co-employees, Jack Bohlken, and Daniel Long, the plant manager, asserting gross negligence in failing to provide him with a safe machine (section 85.20, The Code 1977). He also sued Travelers Insurance Companies, the employer's worker's compensation insurance carrier, alleging negligence in its safety inspections preceding the accident.[1] The trial court dismissed the claim against Bohlken but overruled motions for directed verdict by Travelers and Long. The jury returned a verdict against both remaining defendants.

On appeal, Long asserts error by the trial court in submitting the case to the jury because he owed no duty to Thompson and because there was no substantial evidence upon which the jury could find the "gross negligence amounting ... to wanton neglect" required by section 85.20 for a suit against a co-employee. He also claims errors in respect to several evidentiary rulings by the court. Travelers, in its separate appeal, argues that its "accident prevention surveys" were not inspections which would raise a duty of care under section 324A of the *Restatement (Second) of Torts* (1965), that insufficient evidence as to the condition of the press was introduced at trial, that the requisite elements for liability for negligent inspection under section 324A had not been established, and that the court erred in several evidentiary rulings. We reverse on Long's appeal; we affirm in part and reverse in part on Travelers' appeal.

The evidence at trial established that Thompson had worked for Farmaster for approximately a year at the time of the accident. He was usually employed in another department but on the day before the accident was transferred to the press department because of a shortage of work in his own area. His new assignment was to operate a seventy-ton press to make components for Farmaster's gates. These "slide latch bodies" were constructed of sheet metal and were formed in a four-stage process by the press, which used a ram and die. The metal was automatically fed from a coil into the press and advanced each time the machine was engaged. However, when the coil of metal was nearly expended, the operator was required to manually advance the metal through the machine, stage by stage, using a screwdriver, and then stroking the press at each stage of the punching and forming process. A control box with key, separately mounted on the side of the press, allowed for the selection of the machine's mode of operation, by either foot or hand control. The hand controls consisted of two separate push buttons, one on each side of the press; in order to engage the machine it was necessary to depress the

---

1. The plaintiff also filed suit in federal court against the manufacturer and the distributor of the press, claiming that the machine was defectively designed, that improper warnings were given as to its inherent dangers, and that inadequate operating instructions were given. None of those claims were asserted in this case.

buttons simultaneously. Use of these buttons would virtually foreclose the possibility of the operator inserting his hands into the die area. The foot control, which could also activate the press, was housed in a small metal box on the floor. Access to the control box was restricted by a spring-release door; in order to engage the press it was only necessary to pull down on the door by foot, slide the foot inside the box, and depress a small pedal. If this mode of operation were used by the operator, vertical metal bars, located in front of the press' die area, theoretically guarded against the insertion of objects into the moving parts. These metal guards could be raised and lowered, the height determined by the particular die used in the press.

Although he had previously operated a press at Farmaster "quite a few times," Thompson was instructed on the day before his accident by Ray Hockenberry, an employee in Farmaster's tool-and-die department, on how to operate a press using a latch-body die. After receiving these instructions, Thompson operated the punch press for the remainder of the afternoon. Thompson testified that when he arrived for work the next morning, the key to the selector switch was turned to the foot-control method of operation, and the door to the control's housing was propped open with a heavy metal bar, allowing the operator to directly insert his foot into the box and to activate the press. In addition, the metal guards on the press were either removed or raised to a height of about one foot, exposing the die area, and allowing room to insert a hand into it. Thompson sat on a stool in front of the press and worked for one to two hours before he reached the end of the coil of sheet metal. He had been operating the machine by foot control because "that's the way it was . . . . it was set up for that operation and here it is . . . . run it." While attempting to remove the last portion of metal from the press with his left hand, the machine was activated and Thompson's fingers were severed.

## I. Liability of co-employee Long.

As an employee covered by worker's compensation, Thompson's right to maintain an action against Long, as a co-employee, is governed by section 85.20, The Code. That statute states that worker's compensation is the exclusive remedy against a co-employee, "provided that such injury . . . is not caused by the other employee's *gross negligence amounting to such lack of care as to amount to wanton neglect for the safety of another.*" (Emphasis added.) The emphasized portion of the statute was added in 1974, apparently in response to a decision of this court recognizing the right to sue co-employees based upon acts of "simple" negligence in breaching safety-related duties owed to co-employees. *Craven v. Oggero*, 213 N.W.2d 678, 682 (Iowa 1973); *accord, Davis v. Crook*, 261 N.W.2d 500, 503 (Iowa 1978) (injury predating 1974 amendment; prior law applicable); *Kerrigan v. Errett*, 256 N.W.2d 394, 396–97 (Iowa 1977) (same). This case presents the first opportunity for this court to interpret the amendment restricting the right to maintain such suits.

The term "gross negligence" is said to be nebulous, without a generally-accepted meaning: It implies conduct which, while more culpable than ordinary inadvertence or unattention, differs from ordinary negligence only in degree, not kind. W. Prosser, *Handbook of the Law of Torts* § 34, at 183–84 (4th ed. 1971). However, the legislature added a new dimension and a certain amount of refinement to the term "gross negligence" in section 85.20 by providing it must "amount to *wanton* neglect for the safety of another." (Emphasis added.)

Similar to wilful or reckless conduct, "wanton" conduct lies somewhere between the mere unreasonable risk of harm in ordinary negligence and intent to harm. Prosser, *supra*, at 184–85. The author further explains the concept:

> The usual meaning assigned to "wilful," "wanton" or "reckless," according to taste as to the word used, is that the actor has intentionally done an act of an

unreasonable character in disregard of a risk known to or so obvious that he must be taken to have been aware of it, and so great as to make it highly *probable* that harm would follow.

*Id.* at 185 (emphasis added). It is said that the concept involves the combination of attitudes: a realization of imminent danger, coupled with a reckless disregard or lack of concern for the *probable* consequences of the act. *Friesen v. Chicago, R.I. & Pacific R.R.*, 215 Kan. 316, 524 P.2d 1141, 1147 (1974) (railroad aware of prior accidents at same crossing and of safety recommendations for improvements failed to make crossing changes; held not wanton neglect). Another authority labels both "wanton" and "wilful" misconduct as "reckless disregard for the safety of another," *Restatement, supra* § 500, at 587, and distinguishes it from intentional misconduct only in that it requires a realization of a strong *probability* of harm to another rather than the substantial *certainty* accompanying an intentional act, *id.* § 500(f), at 590.

Other authorities distinguish between wilfulness, characterized by intent to injure, and wantonness, which merely implies an indifference to whether the act will injure another. *E. g.*, 57 Am.Jur.2d *Negligence* § 102, at 452–53 (1971). The difference is illustrated by comparing the throwing of an object with intent to strike another and throwing it without such intent, but believing that it will, in fact, strike another, and proceeding with indifference as to whether it does not. *See Siesseger v. Puth*, 213 Iowa 164, 172, 239 N.W. 46, 50 (1931). Wantonness is said to be less blameworthy than an intentional wrong only in that instead of affirmatively wishing to injure another, the actor is merely willing to do so. *Id.*

■ We conclude, in view of the foregoing, that there are three elements necessary to establish "gross negligence amounting to such lack of care as to amount to wanton neglect" under section 85.20: (1) knowledge of the peril to be apprehended; (2) knowledge that injury is a probable, as opposed to a possible, result of the danger; and (3) a

conscious failure to avoid the peril. *See Friesen*, 215 Kan. at 322–23, 524 P.2d at 1146–49; Prosser, *supra* at 184–86.

Much of Thompson's evidence on the issue of wantonness was disputed; however, when viewed in the light most favorable to him, it showed that Long knew the guard on the press in question was maintained at a height sufficient to allow entry of the operator's hand, that the key for changing the operational mode was usually left in the press, and that the access door to the foot control switch was propped open for easy access. There was also evidence that although Long was present in the press room when presses were operated without adequate guarding, he failed to respond by providing guards or enforcing safety rules for their operation. Another employee, it was shown, lost several fingers in a press before Thompson's injury, and other, less serious injuries also had occurred in Farmaster presses.

■ Thompson contends this conduct on the part of Long amounted to more than simple negligence, signifying an absence of care showing he "completely disregarded the consequences which were obvious and which he knew would naturally flow from his failure to act in seeing that the machine was properly set up and properly guarded." However, even though other injuries had occurred in other Farmaster presses, none had occurred under similar circumstances and no injuries had occurred with this particular press in the several years Farmaster had used it. Thus it cannot be claimed that Long was aware by observation or experience that such injury would be a probable consequence of the operational practices of which he was claimed to be aware. It is also significant that no safety inspection had put Long on notice of any defect in the press. *See* 2A A. Larson, *The Law of Workmen's Compensation* at 13–51 (1978) ("serious or wilful misconduct" of employer giving rise to penalty recovery by employee). The most the evidence establishes under these circumstances is a want of ordinary care; there was no evidence that under the facts known or which should have

been known to Long, such an injury was *probable. See Bains v. Western Pacific R.R.,* 56 Cal.App.3d 902, 905–908; 128 Cal. Rptr. 778, 779–81 (1976) (violations of train speed and braking statutes insufficient to constitute "wilful" negligence); *Friesen,* 215 Kan. at 324, 524 P.2d at 1148 (maintenance of train crossing in allegedly dangerous conditions not wanton negligence); *Bensen v. South Kitsap School District,* 63 Wash.2d 192, 386 P.2d 137, 140 (1963) (allowing obstruction to remain on premises not wanton negligence); 56 Am.Jur.2d, *supra* § 102, at 452–55.

We conclude the trial court erred in refusing to grant Long's motion for directed verdict; the evidence fell short of establishing wantonness. In view of this holding, it is unnecessary to consider the remaining issues raised by Long on his appeal.

## II. Liability of Travelers.

Travelers was the insurance carrier for Farmaster Products and for several years prior to Thompson's injury had conducted what it called "accident prevention surveys," which included semiannual inspections of Farmaster's premises. These surveys were scheduled several days in advance to assure that management personnel at the plant would be present at the time they were made. A typical survey would first involve a review by the Travelers representative of all accident reports compiled since the last inspection, then an inspection of the plant, followed by a meeting with plant management to discuss his findings and recommendations. Following completion of the survey, Travelers prepared a letter of confirmation which was mailed to Farmaster, with copies to its parent company and its insurance broker. These letters of confirmation contained the inspection report of Travelers' representative, pointing out unsafe conditions and employee practices, and recommending procedures to correct them. In addition to its accident prevention surveys, Travelers made available a "safety leadership program" for its insureds' supervisory personnel "to increase their awareness and knowledge of how to prevent accidents." One such program had been presented by Travelers at Farmaster before Thompson's injury.

A. *The directed-verdict and judgment-n. o. v. motions.* Despite the fact Travelers had conducted at least four inspections of the Farmaster plant prior to Thompson's injury, none of the allegedly hazardous conditions or practices discussed in Division I were noted in its reports. However, Travelers argues that the nature of its relationship to Farmaster, as its insured, did not give rise to a duty of care in its inspections and that, in any event, the evidence was insufficient to submit the issue to the jury. It argues that its surveys and safety programs were purely voluntary as far as its insureds were concerned: they were free to take advantage of them, or not, at their discretion. According to it, the surveys were advisory only and were merely a "service" to Farmaster; Travelers assumed no responsibility for defects on the premises or for their correction. In support, Travelers cites this disclaimer provision of its confirmation letters to Farmaster:

This report is based upon conditions and practices observed and information supplied by management personnel at the time of this visit. It does not purport to list all hazards nor to indicate that other hazards do not exist. Inspections and recommendations made by The Travelers are advisory and designed to assist insureds in the establishment and maintenance of their own safety activities. The Travelers assumes no responsibility for management and control of these activities nor for the correction of the conditions pointed out herein.

■ Despite Travelers' contention that the case is distinguishable, we have clearly recognized a cause of action against an insurer based upon negligence in conducting "gratuitous" inspections. *See Fabricius v. Montgomery Elevator Co.,* 254 Iowa 1319, 1325–27, 121 N.W.2d 361, 363–65 (1963) (suit by employee against worker's compen-

sation carrier).[2] The legislature initially responded to *Fabricius* by prohibiting suits based on such inspections, § 88A.14, The Code 1966 ("No inspection of any place of employment made by insurance company inspectors . . . shall be the basis for imposition of civil liability upon the inspector or the insurance company . . . ."). *See Bowen v. Kaplan*, 237 N.W.2d 799, 80 (Iowa 1976); 2A Larson, *supra* § 72.90, at 14–123. However, we note that in 1972 the prohibition against such suits was omitted. 1972 Session, 64th G.A., ch. 1028, § 1; *but see* § 517.5, The Code 1979. We conclude that claims against insurance carriers were not considered by the legislature to be inimical to the purposes of worker's compensation or public policy at the time of Thompson's accident. *See* 2A Larson, *supra* § 72.90, at 14–123–164 (claims by employees against worker's compensation insurance carriers as third parties).

Section 324A of the *Restatement* imposes liability for gratuitous inspections, and it is apparent the trial court relied upon that section in framing its instructions to the jury. It provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

*Id.* § 324A, at 142. The *Restatement* rule is consistent with the holding of *Fabricius* and with the prevailing view of cases from other jurisdictions. *See, e. g., Evans v. Otis Elevator Company*, 403 Pa. 13, 168 A.2d 573

(1961) (employee's action against elevator company based upon negligent inspection of employer's elevator); Prosser, *supra* § 56, at 347–50; Annot., *Compensation Carrier— Negligence*, 93 A.L.R.2d 598 (1964).

Application of section 324A, which we here adopt, depends on whether there was substantial evidence that the inspection was one which Travelers should have recognized as necessary for the protection of third persons and, if so, that (1) such inspection increased the risk of harm or (2) harm was suffered by Thompson because of reliance by him or by Farmaster on the inspection.[3] If these elements are established, liability may be imposed even if the inspections were voluntary, or only a "service" to Farmaster, as Travelers asserts.

The source of Travelers' duty of care, under the *Restatement*, is independent of any duty of Farmaster, as the employer, to provide a safe place of employment; Travelers' argument that it cannot be charged with such a duty, because it is nondelegable, is therefore inapposite. Travelers also argues that it cannot be held under a duty of inspection under its insurance contract with Farmaster. However, its liability for its inspections does not arise from, nor is it circumscribed by, the contract of insurance; it arises, if at all, from its undertaking the responsibility of making such inspections in such a manner as to increase the risk of harm or create reliance to another's detriment. *See Restatement, supra* § 324A, at 142.

B. *Liability under section 324A(a).* Increased risk of harm under subsection (a) is illustrated by the *Restatement* :

> A operates a grocery store. An electric light hanging over one of the aisles of the store becomes defective, and A calls B Electric Company to repair it. B Company sends a workman, who repairs the light, but leaves the fixture so insecurely attached that it falls upon and injures C, a customer in the store who is walking

---

2. We have also recognized an enforceable duty of care based upon a city's fire inspection pursuant to city ordinance. *See Wilson v. Nepstad*, 282 N.W.2d 664 (Iowa 1979).

3. The trial court instructed the jury only as to subsections (a) and (c); it did not instruct on subparagraph (b), undertaking a duty owed by another, and that ground is not before us.

down the aisle. B Company is subject to liability to C.

*Restatement, supra* § 324A, Comment c, Illustration 1.

■ When the evidence is viewed in the light most favorable to the plaintiff, *Pease v. Zazza*, 295 N.W.2d 43, 46 (Iowa 1980), the jury could find that this press was inadequately guarded, operable by foot, independently of the hand controls which would have prevented Thompson's injury; that the foot-control access door was propped open, permitting accidental activation; and that the key controlling the mode of operation was left in the control box at all times. It could further find that these conditions existed at the time of Travelers' inspections, which failed to reveal them. However, this evidence showed only that the risks present at the time of the inspections remained unchanged; there was no evidence of any changes brought about by Travelers in the machine or Farmaster's operating procedures which could be said to have increased the risk. Thus, there was insufficient evidence of liability under *Restatement* section 324A(a), and the trial court erred in submitting that issue to the jury.

■ C. *Liability under section 324A(c).* On the issue of liability under subsection (c), there was evidence from which the jury could find Farmaster relied upon these inspections and Thompson was injured as a result of such reliance. Despite Travelers' assertion that Farmaster personnel had enough practical experience to know unguarded presses were dangerous and that it had its own safety committee, Travelers clearly represented itself as possessing superior expertise in the area of plant safety. Its inspector, in contrast to the members of Farmaster's internal safety committee, had formal education in areas pertinent to accident prevention; Farmaster obviously considered Travelers to possess greater knowledge in the area because it arranged for Travelers' personnel to come to Farmaster's plant and conduct a safety school. Travelers' own inspector testified he would expect Farmaster to rely upon these inspections.

We conclude the court properly submitted the issue of liability under subsection 324A(c).

III. *The rulings on evidence.*

■ Travelers asserts several errors in the trial court's rulings on its objections to certain exhibits and testimony at trial. It asserts error, first, in the introduction of several photographs showing the press and the foot control, as well as slide latch bodies, produced by the press, in several stages of completion. Travelers objected on the ground, among others, that "there was no proper and sufficient foundation to show that any Travelers' representative had seen the conditions depicted." However, whether or not Travelers' representatives had seen the condition is not determinative of the admissibility of the photos if they portrayed their subjects as of the date of the accident; the fact Travelers' inspectors failed to see them merely fortifies Thompson's claim Travelers did an inadequate job of inspecting. Travelers also objected on the ground that there was an inadequate showing the conditions depicted were the same as those which existed at the time of the accident. The trial court, however, apparently concluded there was such a showing, and it has considerable discretion in such matters. *Wiedenfeld v. Chicago & Northwestern Transportation Co.*, 252 N.W.2d 691, 699 (Iowa 1971); *see* C. McCormick, *Handbook of the Law of Evidence* § 214, at 533–34 (1972). The court's discretion was not abused; there was ample testimony by plant personnel to establish the similarity of the conditions portrayed.

■ Travelers also asserts error in allowing testimony by Farmaster's manager, Long, as to his duties, Farmaster's guarding practices, and his awareness of danger in using the press, over the objection that such evidence was not "binding" upon Travelers, only upon Long. The objection that the evidence is "not binding" upon Travelers, standing alone, is insufficient to cause its exclusion, absent a specific objection as to *why* it is not binding. M. Ladd & R. Carlson, *Cases and Materials on Evidence* 120–

21 (1972); *see Shinrone, Inc. v. Tasco, Inc.*, 283 N.W.2d 280, 288 (Iowa 1979).

 Travelers objected to Thompson's testimony as to his manner of operating the press, and as to how others had operated it, on the grounds of "no proper, sufficient" foundation and relevancy. The objection failed to state in what respect the foundation was lacking and the objection as made was insufficient to raise the issue. *See Shinrone*, 283 N.W.2d at 288. Evidence is relevant if it renders the existence of a fact more probable or less probable with it than without it. *Carson v. Mulnix*, 263 N.W.2d 701, 706 (1978). We believe the testimony here satisfied the test of relevancy; the evidence as to the other employees' operation of the press was relevant to show the condition existing at the plant which should have been observed on inspection and what effect, if any, Travelers' failure to point out the hazards to Farmaster had upon its manner of operation. Questions of relevancy are for the trial court to resolve in its discretion, *id.*, and we see no abuse here.

 The testimony of Professor Gary Hansen, Thompson's safety expert, was challenged on the general ground he was not qualified to express an opinion on the subject matter involved. Questions specifically asking for his opinions as to the sufficiency of Travelers' inspection procedure, the cause of the injury, and whether Travelers' inspections had contributed to it also prompted objections by Travelers. First, as to Hansen's general qualification, receipt of expert testimony is a matter lying largely in the discretion of the trial court and we will reverse only upon manifest abuse of that discretion, *Shinrone*, 283 N.W.2d at 288. Hansen was currently employed at Oklahoma State University as an associate professor, having received his doctorate following study concentrated on industrial psychology, industrial education, and education psychology. He had taught at Purdue University in manufacturing technology and had taught courses in manufacturing technique at the college level, as well as courses in industrial safety and tool design.

He had been employed as a safety consultant for insurance companies and had conducted plant inspections himself. We believe the trial court was well within its discretion in receiving Hansen's testimony.

 Objections to specific questions put to Hansen were based primarily on the fact that he was unfamiliar with the standards of the industry and thus could not evaluate the sufficiency of Travelers' inspection and reporting procedures. The trial court, presumably on the basis of Hansen's background, concluded otherwise. Hansen's testimony on the cause of the accident and the causal connection between it and Travelers' inspections were within his areas of expertise in design, safety procedure, and employee psychology; the testimony was within the trial court's discretion, *see id.*

Finally, Travelers raises a potpourri of other alleged errors which, it contends, requires a new trial. It reasserts specific errors urged in other divisions and argues that, even if they would not be grounds for reversal standing alone, their cumulative effect denied it a fair trial. Because we remand for a new trial on the ground discussed in Division II(B), it is not necessary to address these matters.

Costs on appeal are taxed one-half to Travelers and one-half to Thompson. RE-VERSED ON LONG'S APPEAL; RE-VERSED AND REMANDED ON TRAVELERS' APPEAL.

All justices concur except ALLBEE and McGIVERIN, JJ., who concur in part and dissent in part.

ALLBEE, Justice (concurring and dissenting).

Although I concur in Divisions I and III and much of Division II, I must dissent from Division II–C and that portion of the Division II result which remands the case for a new trial.

First, I find no substantial evidence in the record from which the jury could have found that the dangerous conditions which caused plaintiff's injury existed at the time

Travelers made any of its inspections. But even assuming, *arguendo*, that the evidence was sufficient in that regard, I cannot agree with the court's conclusion in Division II–C that there was sufficient evidence to submit the issue of Travelers' liability to the jury under subsection (c) of the Restatement test. *See* Restatement (Second) of Torts § 324A(c) (1965).

Liability under subsection (c) must be predicated upon the "reliance" of either the plaintiff or his employer on Travelers' inspections. There is no evidence that plaintiff was aware of Travelers' inspections; thus, he himself could not have relied on them. As to Farmaster, even assuming it relied on the inspections, this reliance was clearly unjustifiable in light of Travelers' repeated admonitions to the employer that its inspection reports did "not purport to list all hazards nor to indicate that other hazards do not exist." Travelers also repeatedly informed Farmaster that the inspections were merely "advisory" and for the purpose of assisting the employer in maintaining the employer's *own* safety program.

"Under the Restatement rule, . . . [t]he carrier may . . . be liable if the employer so relied on the insurer's undertaking that it neglected its own safety inspection program to [the employee's] detriment." *Stacy v. Aetna Casualty & Surety Co.*, 484 F.2d 289, 295 (5th Cir. 1973). This reliance must be "reasonable." *See Tillman v. Travelers Indemnity Co.*, 506 F.2d 917, 920. In the case at bar, there is no evidence from which a jury could find that Farmaster had a reasonable basis for relying on Travelers' inspections to the point of neglecting its own duty to inspect for work hazards.

Because there was insufficient evidence of liability under either subsection (a) or (c) to generate a jury question, trial court should have granted Travelers' motion for a directed verdict. Consequently, I would set aside the judgment against Travelers without remanding for a new trial.

McGIVERIN, J., joins this dissent.