**Carolyn STEWART, Plaintiff,**

v.

**SOUTHEAST KANSAS RAILROAD COMPANY and South Kansas and Oklahoma Railroad, Inc., Defendants.**

**No. 97–1214–WEB.**

United States District Court,
D. Kansas.

July 1, 1998.

Andrew W. Hutton, Hutton & Hutton, Wichita, KS, Craig R. Oliver, Daniel R. Wichmer, Miller & Sanford, P.C., Springfield, MO, for plaintiff.

Christopher A. McElgunn, Klenda, Mitchell, Austerman & Zuercher, L.L.C., Wichita, KS, A. J. Wachter, Wilbert & Towner, P.A., Pittsburg, KS, for defendants.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

This action arises out of a train-automobile collision near Fredonia, Kansas, on October 3, 1995. Plaintiff, the driver of the automo-

bile, alleges that acts or omissions of defendant South Kansas and Oklahoma Railroad, Inc. ("SKOR"), which owned and operated the train and rail line, caused the injuries she sustained in the accident. Plaintiff asserts claims for negligence and punitive damages. The matter is now before the court on defendant SKOR's motion for summary judgment. (Doc. 40). The court finds that oral argument would not assist in deciding the issues presented.

### I. Defendant South Kansas and Oklahoma Railroad ("SKOR").

SKOR seeks summary judgment only on plaintiff's claim for punitive damages, arguing there is no evidence that its conduct was willful or wanton. Plaintiff argues that the evidence gives rise to a genuine dispute of fact.

The standards and procedures for summary judgment are well established and will not be fully repeated here. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In essence, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Id.*

#### a. Facts.

Based on the submissions of the parties, the court finds no genuine dispute as to the following facts.[1]

This action arises out of a train-vehicle collision that occurred on October 3, 1995, at a highway-railroad crossing located outside of Fredonia, Kansas, and which is referred to as Crossing No. 007203.

The plaintiff is a citizen of the State of Missouri. The defendants are Kansas corporations and have their principal places of business in Kansas. The amount in controversy exceeds $75,000.

The particular rail line involved was owned by Defendant South Kansas and Oklahoma Railroad, Inc. ("SKOR") and not by defendant Southeast Kansas Railroad Company ("SEKR").

In 1990, SKOR purchased the rail line at issue from the Atchison, Topeka & Santa Fe Railroad.

The train involved in the October 3, 1995, collision was operated by SKOR and consisted of four (4) locomotives and fifty-nine (59) freight cars. SKOR owned three of the four locomotives and it leased the fourth from SEKR.

At the time of the October 3, 1995, collision, the train was operated by a two-man crew: Engineer Michael D. Allen ("Allen") and Conductor Timothy A. Yadon ("Yadon"). Both men were, and still are, employed by SKOR.

Prior to being eligible to perform engineer duties, SKOR required Allen to undergo at least forty hours of classroom training and eighty hours of on the job training under a supervisor. After becoming an engineer, Allen is required to continue classroom training. Prior to becoming eligible to perform conductor duties, Yadon was required to undergo classroom training, and has continued to receive classroom training, including training on safety issues.

At the time SKOR purchased the rail line encompassing Crossing No. 007203D, the track was classified as a Class III track with a speed limit of forty (40) miles per hour.

In 1992–93, SKOR instituted a general order decreasing the speed limit to twenty-five (25) miles per hour for trains traveling on the

---

**1.** Plaintiff's response sets forth a statement of facts without referring to or specifically controverting the defendant's statement of facts. This approach does not comply with D.Kan.R. 56.1. By the same token, defendant's reply does not address the plaintiff's additional statement of facts. Moreover, defendant's motion for summary judgment was prepared without the realization that plaintiff's expert Dr. K.W. Heathington had prepared a report concerning the crossing. *See* Docs. 57–59, 62. These failures make it more difficult than it should be to clearly state which facts are controverted. Under the circumstances, the court has simply set forth both parties' statement of facts. In keeping with the standards governing summary judgment, the court will assume the truth of the plaintiff's version of events on any genuinely disputed issues (such as the speed of the train and the presence of vegetation blocking the plaintiff's view).

rail line that encompasses Crossing No. 007203D.

Crossing No. 007203D was equipped with a white crossbuck crossing sign located ten (10) feet south of the crossing and a round railroad crossing warning sign five hundred and three feet (503) south of the crossing.

Immediately after the accident, the Kansas Highway Patrol Trooper who investigated the accident, Master Trooper Bud Handshy, took photographs of the subject crossing that are an accurate representation and portrayal of the accident site.

Just west of Crossing No. 007203D, there is a whistle post or whistle board 1,331 feet from the crossing. SKOR's engineers are instructed to sound the whistle of the locomotive at the whistle post and to continue to do so until such time as the locomotive is through the crossing.

Prior to October 3, 1995, SKOR was not aware of any previous accidents at Crossing No. 007203D.

SKOR has personnel responsible for inspecting crossings for weeds and foliage, and cuts down and mows weeds and foliage on crossing right of ways for a distance of between 200 to 250 feet from each side of the crossing.

SKOR personnel responsible for crossing safety considered Crossing No. 007203D to be an open crossing without unsafe sight restrictions.

Defendants have retained an expert, Michael L. Marler, P.E., to calculate and determine sight lines at the crossing. His expert report sets forth his opinion that the railroad right of way at issue was clear of any significant brush or obstruction in accordance with Federal Railway Administration and State of Kansas requirements and that the crossing in question has very good visibility in the direction that Plaintiff's vehicle approached the crossing.

Defendants have also retained an expert, James Summers, to determine the speed of the train at issue at or about the time of emergency brake initiation. His expert report set forth his opinion that the train was traveling at or about twenty-three (23) miles per hour at the time the train crew initiated emergency braking.

The train involved in the October 3, 1995, collision traveled a route from Coffeyville, Kansas, to Chanute, Kansas, to Fredonia, Kansas. At the time of the collision, the train was approaching Fredonia, Kansas.

The collision occurred at approximately 3:45 p.m. The weather was clear and sunny, and the temperature was at least seventy (70) degrees.

In operating the train, Allen and Yadon rode in the lead locomotive with Allen setting on the right side of the locomotive and Yadon riding on the left side.

As the train approached the whistle post, Allen saw plaintiff driving her red Mazda pickup truck traveling north on the 15th Street Road approximately one half (½) mile from the crossing. At the whistle post and until the collision, Allen blew the train's whistle and operated its bell.

At the time Allen and Yadon first observed plaintiff's vehicle, they both believed that there was no potential for a collision.

As the plaintiff's truck approached the crossing, and at a point when her truck was 100 to 150 feet from the crossing, Yadon and Allen observed her applying the brakes to the truck.

At all times leading up to the collision, Yadon and Allen believed that plaintiff would be able to stop her pickup in time to avoid a collision.

Yadon observed plaintiff's truck collide with the train while the train was in the crossing and told Allen to "plug it," meaning apply the emergency brakes. Thereafter, Allen applied the emergency brakes to stop the train.

Plaintiff typically followed a route to and from her employment that required her to travel over Crossing No. 007203D at least once or twice a day. She was aware that Crossing No. 007203D existed and had previously seen stationary rail cars on the track, but no moving trains.

Plaintiff testified that as she approached the crossing, her passenger side window was closed and her driver's side window was open. She also had the radio turned on. From his investigation, Trooper Handshy

concluded that the passenger side door window was in fact rolled up.

Plaintiff testified that she saw the train as it came by some vegetation and trees at which time she "slammed" on her brakes. She testified that she was traveling fifty-five miles per hour or less at the point in time she applied her brakes.

At the time plaintiff applied the brakes and up to the collision, she believed that she would be able to stop in time to avoid the collision.

Plaintiff testified that she has no recollection of looking for a train when she approached the crossing, and did not expect to encounter a train.

Plaintiff testified that she does not recall how close she was to the crossing at the time she first saw the train and does not recall the distance from the train to the crossing. She also does not recall hearing the train's whistle.

Any trees in the area of the crossing are not located on the railroad right-of-way, but are located on property owned by a third party.

During the nine months prior to the collision, there were an average of 2.7 train crossings per day at Crossing No. 007203D.

Trooper Handshy testified at deposition that he believed that the average motorist should not have a problem with seeing an approaching train at Crossing No. 007203D and, in his opinion, the cause of the accident was plaintiff's failure to yield the right-of-way to the oncoming train.

Allen and Yadon have testified that at or about the time of the collision, the train was traveling at a speed of twenty (20) to twenty-five (25) miles per hour.

*Plaintiff's Additional Statement of Facts.*

Although plaintiff had previously traveled across the railroad crossing, she had never been present at the crossing when a train was moving through the crossing.

Plaintiff testified that she may have seen a stationary train further down the tracks on one occasion.

The crossing in question, according to plaintiff, was marked by "two little stand up cross signals that were bent way over and not really in proper repair." Other than that set of signs, plaintiff has no other recollection of additional signage.

Plaintiff's first view of the train was when she saw it coming from behind thick vegetation and trees, at which point she slammed on her brakes.

At no point does plaintiff recall ever hearing any whistle.

At the time plaintiff was traveling through the crossing, she was traveling at 55 miles per hour or less.

The speed limit at the crossing on 15th Street was 55 miles per hour.

Prior to seeing the train, plaintiff had not observed any activity on either side of the road.

Plaintiff also testified that she always looked to both sides when she approached the crossing intersection. This would include looking down the tracks.

Plaintiff testified that the trees and vegetation at the crossing prevented her from seeing the train prior to the point in time in which she first saw the train.

The vegetation and trees to which plaintiff was referring were close to the crossing intersection. The trees and vegetation were thick enough to cover the train and its movement.

The crossing in question has an advance warning sign and crossbucks. There are no advance pavement markings, center line markings, no-passing markings, stop lines, nor stop ahead signs at the crossing. In addition, the condition of some of the traffic control devices was poor.

Prior to plaintiff's collision with the train at the intersection, the crossing had had train-automobile accidents which occurred on June 6, 1981 (property damage of vehicle), and July 20, 1984 (property damage and three fatalities).

At the time of the accident, defendant's train was traveling in excess of 35 miles per hour.[2]

---

**2.** See note 1, supra.

At the time of the accident, the speed limit for rail traffic at the crossing was 25 miles per hour.

In the opinion of K.W. Heathington, in light of the number of prior accidents coupled with the amount of motor vehicle and train traffic, the crossing had a significant accident history.

The crossing at 15th Road is ultra-hazardous and poses a serious safety consideration since there are serious deficiencies in sight distance, inadequate warnings and signage, and complex roadway geometry including horizontal and vertical alignment.[3]

Information concerning accident history of crossings can easily be obtained from the Federal Railroad Administration.

Despite the ability of defendant SKOR to obtain information concerning prior accident history at that particular location, defendant did not obtain such information.

Defendant does not evaluate crossings for safety in terms of the type of traffic control devices needed to provide adequate safety for the traveling public.

It is the opinion of K.W. Heathington, plaintiff's expert, that based on all of the above facts, that defendant's decision to ignore safety problems and conduct operations which further degrade the safety of the railway crossing in question is a willful and wanton disregard for the safety of the traveling public using the 15th Road crossing.

*b. Discussion.*

■ The court has jurisdiction of the action by virtue of 28 U.S.C. § 1332. The substantive law of Kansas governs the dispute. *See Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) (in diversity actions, federal court must apply the substantive law of the forum state); *Ling v. Jan's Liquors,* 237 Kan. 629, 634, 703 P.2d 731 (1985) (on tort claims, Kansas follows the rule of lex loci delicti, which means the law of the place of the wrong controls).

■ In order to recover punitive damages under Kansas law, a plaintiff must prove by clear and convincing evidence that the defendant acted toward plaintiff with willful conduct, wanton conduct, fraud or malice.

K.S.A. § 60–3701(c). In this case, plaintiff argues that SKOR's conduct towards her was wanton. Wanton conduct requires a showing that the defendant had a realization of imminent danger from its actions and a reckless disregard, indifference and unconcern for the probable consequences. *Friesen v. Chicago, Rock Island & Pac. Railroad,* 215 Kan. 316, 322–23, 524 P.2d 1141, 1147–48 (1974).

■ Plaintiff devotes a good portion of her response brief to arguing that Crossing No. 007203D was unusually dangerous, that SKOR had a duty to take reasonable measures to make the crossing safer, that SKOR failed to do so, and that plaintiff's injuries were caused by this failure. Pl.Resp. at 6–10. If proven at trial, such facts would show that SKOR was negligent. But a showing of negligence does not suffice to establish wanton conduct. "[O]ne may be found guilty of failing to exercise due care without having a realization of imminent danger." *Friesen,* 215 Kan. at 323, 524 P.2d at 1148. Plaintiff has cited no evidence to show that SKOR had a realization of imminent danger from its acts or omissions.

■ Plaintiff also relies on the fact that the crossing had a significant accident history and that SKOR took no action to review the safety of the crossing or to ascertain its accident history. Pl.Resp. at 8. Even if it were determined that in the exercise of reasonable care SKOR should have known about these prior accidents or about the dangerous character of the crossing, that alone would not give rise to a claim for punitive damages. There must be knowledge by the defendant of the dangerous condition before the defendant's conduct can be said to be wanton. *Lanning v. Anderson,* 22 Kan.App.2d 474, 481, 921 P.2d 813, 819 (1996). It is undisputed that at the time of plaintiff's accident SKOR was unaware of the crossing's accident history. There is no evidence of other accidents occurring while SKOR owned the rail line that would have put the railroad on notice of the allegedly dangerous character of the crossing prior to this incident. Nor is there any evidence that SKOR personnel believed or realized there was a high probability of injury from the allegedly dangerous

---

**3.** See footnote 1, supra.

circumstances at the crossing. *See Friesen v. Chicago, Rock Island & Pac. Railroad,* 215 Kan. 316, 323, 524 P.2d 1141, 1148 (1974) ("The presence of a railroad crossing in itself creates some danger, but it is difficult to reason that the railroad at this particular time and place realized a collision between the train and a motor vehicle was about to take place.") In sum, plaintiff cites nothing to reasonably support a finding that SKOR's conduct towards plaintiff was taken with a realization of imminent danger. *Cf. Lanning,* 22 Kan.App.2d at 482, 921 P.2d 813 ("There is no evidence of [defendants'] disregard of a known or obvious risk that was so great as to make it highly probable that harm could follow.").

■ Included in plaintiff's argument for punitive damages are assertions that the train was speeding at the time of the accident and that SKOR allowed trees and vegetation to grow close to the crossing which prevented plaintiff from seeing the train in time to stop safely. Plaintiff also intimates, although she does not state directly, that the engineer failed to blow the train's whistle prior to the accident. Even assuming the record gives rise to a genuine dispute of fact concerning these allegations of negligence, they are nevertheless immaterial insofar as punitive damages are concerned. Section 60–3701(d) of the Kansas Statutes provides in part that "[i]n no case shall exemplary or punitive damages be assessed pursuant to this section against: (1) A principal or employer for the acts of an agent or employee unless the questioned conduct was authorized or ratified by a person expressly empowered to do so on behalf of the principal or employer; ..." There is no evidence that SKOR authorized or ratified the failures alleged above. In fact, the undisputed facts show the company had policies against such conduct. Under the circumstances, SKOR cannot be liable for punitive damages even if its agents were negligent as asserted above by plaintiff.

■ Lastly, plaintiff relies on her expert, K.W. Heathington, and upon the numerous reasons cited in support of his opinion that Crossing No. 007203D is ultra-hazardous.

The court has reviewed Dr. Heathington's lengthy report but finds no factual basis therein that could reasonably support the elements of a claim for wanton conduct. As stated previously, there is no evidence the railroad had a realization of imminent danger at the crossing. Dr. Heathington's opinion that the danger posed by the crossing was "obvious" or that it "should have been known" by the railroad does not suffice. The defendant does not dispute for purposes of summary judgment that it was negligent in failing to upgrade the crossing. But as the Kansas Supreme Court noted in *Friesen, supra:*

> We believe it can be safely stated that there are many railroad crossings in this state which could be upgraded and as a result lessen the chances of accidents. We cannot conclude therefrom that a railroad should have a realization of imminent danger at all crossings which are in need of upgrading.

*Id.,* 215 Kan. at 323, 524 P.2d at 1148. There is no basis in this record upon which a reasonable jury could conclude that the railroad's conduct was wanton.

*II. Defendant Southeast Kansas Railroad Company ("SEKR").*

■ Plaintiff's complaint also alleged that Southeast Kansas Railroad Company ("SEKR") was liable for plaintiff's injuries along with SKOR because it was jointly involved with SKOR in the ownership and operation of the subject train and rail line. In its motion for summary judgment, SEKR argued it was entitled to judgment because the train and rail line were owned and operated solely by SKOR. Plaintiff's response did not address this contention; instead plaintiff filed a "Voluntary Dismissal" stating that she "hereby dismisses her cause of action" against SEKR without prejudice. Doc. 53. Plaintiff's submission also included a proposed order of dismissal.

A plaintiff is not authorized in these circumstances to dismiss an action without an order of the court. *See* Fed.R.Civ.P. 41(a)(1) & (2).[4] Nevertheless, SEKR has not assert-

---

4. Under the circumstances, the court need not determine whether court approval is required by Rule 41, *cf. Gobbo Farms & Orchards v. Poole Chem. Co.,* 81 F.3d 122, 123 (10th Cir.1996), or by some other provision of the federal rules. *See* 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure:* Civil 2d § 2362 at p. 250 (2d ed.1995).

ed any objection to the proposed dismissal. Def.Repl. at 1. Accordingly, the court will treat plaintiff's filing as a request for dismissal and will order the dismissal of plaintiff's action against SEKR without prejudice.

### III. Conclusion.

Defendant South Kansas and Oklahoma Railroad, Inc.'s Motion for Partial Summary Judgment (Doc. 40) is hereby GRANTED with respect to plaintiff's claim for punitive damages.

Plaintiff's "Voluntary Dismissal" of her cause of action against defendant Southeast Kansas Railroad Company (Doc. 53) is considered by the court as a motion for voluntary dismissal and is GRANTED. Plaintiff's claims against Southeast Kansas Railroad Company are hereby dismissed without prejudice.

IT IS SO ORDERED.