Kim NELSON; Lorie Nelson; Travis D. Nelson, By His Mother and Next Friend, Lorie Nelson; Trever E. Nelson, By His Mother and Next Friend, Lorie Nelson; and Taylor A. Nelson, By Her Mother and Next Friend, Lorie Nelson, Appellants,

v.

WINNEBAGO INDUSTRIES, INC., An Iowa Corporation; John Monson; Robert Miller; Gary Taylor; Michael Hoeft; Michael True; William Lamping; William Prescott; and Rick Willert, Appellees.

No. 98–1986.

Supreme Court of Iowa.

Nov. 16, 2000.

* Senior judge assigned by order pursuant to        Iowa Code section 602.9206 (1999).

Charles H. Levad, Mason City, for appellants.

Richard R. Winga and Darrell J. Isaacson of Laird, Heiny, McManigal, Winga, Duffy & Stambaugh, P.L.C., Mason City, for appellees Monson and Willert.

Mark S. Brownlee of Kersten, Brownlee & Hendricks, L.L.P., Fort Dodge, for appellee Lamping.

Mark R. Crimmins of Bennett, Crimmins, Ostrander & Yung, Fort Dodge, for appellee True.

C. Bradley Price of DeVries, Price & Davenport, Mason City, for appellee Hoeft.

Mark A. Newman of Newman Law Office, Forest City, for appellees Taylor and Prescott.

Lori E. Loftsgard and Joseph M. Barron of Peddicord, Wharton, Thune & Spencer, P.C., Des Moines, for appellees Winnebago Industries and Miller.

LARSON, Justice.

This plaintiff, Kim Nelson, appeals from a summary judgment ruling in favor of his former employer and coemployees. He contends his suit is not preempted by our workers' compensation law and the district court erred in concluding otherwise. We affirm.

## I. *Facts and Prior Proceedings.*

Nelson had worked for the defendant, Winnebago, for several years but quit to take another job. On his last day of work, May 5, 1995, his coemployees threw a pizza party for him. After the party, coemployees taped Nelson with duct tape and carried him to a shower in the plant. In the process, he claims he was dropped from approximately two feet or knee height, causing the injuries for which he has brought suit. The district court ruled that, under Iowa Code section 85.20(1) (1995), Winnebago is liable only under

workers' compensation law and not at common law. The court also ruled the plaintiff's coemployees may not be sued at common law because the plaintiff failed to generate a genuine issue of material fact on the issue of gross negligence under Iowa Code section 85.20(2).

## II. *The Suit Against Winnebago.*

Nelson sued Winnebago, his employer, for the intentional torts of false imprisonment and battery—suits, he claims, that "do not require actual physical injury for recovery" and therefore are not barred by the exclusivity provisions of our workers' compensation law. Winnebago is liable, he claims, because its supervisor, defendant Robert Miller, gave his implicit approval to the prank.

Iowa Code section 85.3(1) provides this trade-off between employers' and employees' rights in the context of work-related injuries:

> Every employer, not specifically excepted by the provisions of this chapter, shall provide, secure, and pay compensation according to the provisions of this chapter for any and all personal injuries sustained by an employee arising out of and in the course of the employment, and in such cases, the employer shall be relieved from other liability for recovery of damages or other compensation for such personal injury.

Iowa Code section 85.20 expands on employer immunity:

> The rights and remedies provided in this chapter, chapter 85A or chapter 85B for an employee on account of injury . . . shall be the exclusive and only rights and remedies of such employee, the employee's personal or legal representatives, dependents, or next of kin, at common law or otherwise, on account of such injury . . . against:
>
> 1. The employee's employer. . . .

The plaintiff contends section 85.20 was never intended to protect employers or "coemployees from common law liability for their intentionally tortious acts" and summary judgment should not have been granted. The plaintiff says a court of appeals opinion implicitly recognized a right of action at common law against an employee for an intentional tort. *See Hanson v. Schaumberg,* 490 N.W.2d 84 (Iowa App.1992). The issues in *Hanson* were (1) whether an intentional tort had been adequately pled, and (2) whether there was sufficient evidence of an intentional tort to avoid summary judgment. The court of appeals affirmed the dismissal of the case on the second ground and did not even consider whether workers' compensation provided the claimant's only remedy.

We have found no case allowing a common-law suit against an employer for the acts of a supervising employee such as in this case. In fact, the general rule is that such suits are not permitted.

> When the person who intentionally injures the employee is not the employer in person nor a person who is realistically the alter ego of the corporation, but merely a foreman, supervisor or manager, both the legal and moral reasons for permitting a common-law suit against the employer collapse, and a substantial majority of modern cases bar a damage suit against the employer.

2A Arthur Larson & Lex K. Larson, *The Law of Workmen's Compensation* § 68.21(a), at 13–113 (1994) (citations omitted) [hereinafter Larson]. The authors of this treatise furnish this rationale for the rule:

> The legal reason for permitting the common-law suit for direct assault by the employer or coemployee, as we have seen, is that the same person cannot commit an intentional assault and then allege it was accidental. This does not apply when the assailant and the defendant are two entirely different people. Unless the employer has commanded or expressly authorized the assault, it cannot be said to be intentional from his standpoint any more than from the

standpoint of any third person. Realistically, it to him is just one more industrial mishap in the factory, of the sort he has a right to consider exclusively covered by the compensation system.

Larson § 68.21(b), at 13–123.

■ In this case, the plaintiff did not claim Winnebago "commanded or expressly authorized the assault" by its supervisory employee, so this case falls squarely under the general rule. We agree with the rationale of the rule and the rule itself. We hold as a matter of law that Winnebago, as the employer, is not liable at common law for the intentional torts of its supervisor, Robert Miller, unless as alleged by the plaintiff, his injuries fall outside the workers' compensation law.

The plaintiff claims he suffered damages that are not covered by workers' compensation, relying largely on *Wilson v. IBP, Inc.*, 558 N.W.2d 132 (Iowa 1996). In *Wilson* we held a former employee's suit for slander was not preempted by workers' compensation because the Workers' Compensation Act provided no adequate remedy for that tort. *Id.* at 137.

Here, the plaintiff claims he is not limited by workers' compensation recovery because his suit for damages based on false imprisonment and battery does not require an "injury" within the meaning of workers' compensation law and is therefore akin to slander as in the *Wilson* case.

■ A. *False imprisonment.* We have defined false imprisonment as an unlawful restraint on freedom of movement or personal liberty. *Valadez v. City of Des Moines*, 324 N.W.2d 475, 477 (Iowa 1982). The elements of the tort are (1) detention or restraint against a person's will, and (2) unlawfulness of the detention or restraint. *Id.* Under the Restatement:

(1) An actor is subject to liability to another for false imprisonment if

(a) he acts intending to confine the other or a third person within boundaries fixed by the actor, and

(b) his act directly or indirectly results in such a confinement of the other, and

(c) the other is conscious of the confinement or is harmed by it.

Restatement (Second) of Torts § 35 (1965). Under this definition, a physical injury is not an element of false imprisonment, and several courts have so held. *See, e.g., Moore v. Federal Dep't Stores, Inc.*, 33 Mich.App. 556, 559, 190 N.W.2d 262, 264 (1971) ("[T]he gist of an action for false imprisonment is unlawful detention irrespective of any physical or mental harm."); *see also Fermino v. Fedco, Inc.*, 7 Cal.4th 701, 30 Cal.Rptr.2d 18, 30, 872 P.2d 559, 571 n. 6 (1994) (citing *Moore* ); *McGowan v. Warwick Corp.*, 691 So.2d 265, 266 (La. Ct.App.1997) (noting that petitioner's claims of, among other things, false imprisonment and defamation did not involve physical or mental injury, and therefore fell outside remedies available under the state's workers' compensation act); *Redican v. K Mart Corp.*, 734 S.W.2d 864, 869 (Mo.Ct.App.1987) ("False imprisonment and malicious prosecution actions do not seek damages covered by the Workers' Compensation Act and therefore are not barred by the act.").

B. *Battery.* Battery is defined by the Restatement in two ways: (1) harmful contact and (2) offensive contact. Restatement (Second) of Torts §§ 13, 18 (1965). The *harmful* contact under section 13 requires a "physical impairment of the condition of another's body, or physical pain or illness." Restatement (Second) of Torts § 15.

■ The second battery alternative does not require bodily injury in the common understanding of that term; rather, it requires *offensive* contact. Thus,

[a]n actor is subject to liability to another for battery if

a. he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an

imminent apprehension of such a contact, and

    b.  an offensive contact with the person of the other directly or indirectly results.

Restatement (Second) of Torts § 18(1) (1965). It does not require a physical injury. Under section 19, "[a] bodily contact is offensive if it offends a reasonable sense of personal dignity." Restatement (Second) of Torts § 19 (1965).

■ C. *Application to facts in suit against employer.* The plaintiff argues his false-imprisonment and battery claims fall outside the scope of our workers' compensation law because they do not require physical injury as a condition to recovery. According to the plaintiff, these claims are not preempted by workers' compensation because workers' compensation does not provide an adequate remedy for his damages. *See Wilson,* 558 N.W.2d at 137.

The problem with the plaintiff's argument is that, while he asserts causes of action against his employer that may in some circumstances provide a remedy for nonphysical injuries, that is not the gist of his suit. He does not demand damages for nonphysical injuries; his petition asserts that, as the result of the defendants' acts, he has

> suffered and continues to suffer serious and permanent personal injuries, mental pain, and mental distress as a result of the acts of defendants. He has incurred medical, hospital and other similar expenses and may in the future incur such expenses. He suffered and will suffer in the future loss of income and loss of earning capacity as a result of the acts of the defendants.

■ A mere labeling of a claim for injuries as false imprisonment or battery because in some circumstances those torts *may* be compensable without a physical injury cannot avoid the exclusivity of work-

ers' compensation if the gist of the claim is for bodily injury. In other words,

> [i]f the essence of the tort, in law, is nonphysical, and if the injuries are of the usual non-physical sort, with physical injury being at most added to the list of injuries as a makeweight, the suit should not be barred. But if the essence of the action is recovery for physical injury or death, *including in "physical" the kinds of mental or nervous injury that cause disability,* the action should be barred even if it can be cast in the form of a normally non-physical tort.

Larson § 68.34(a), at 13–180.

■ In Iowa purely mental injuries caused by the workplace, even in the absence of a physical injury, are compensable under workers' compensation. *See Dunlavey v. Economy Fire & Cas. Co.,* 526 N.W.2d 845, 851 (Iowa 1995). Because such injuries are compensable under workers' compensation, such rights would be exclusive.

We hold the plaintiff's suit is in essence a claim for damages covered by workers' compensation and is therefore barred by Iowa Code section 85.20. This does not leave the plaintiff without compensation, however, because he has received compensation for his medical expenses in the amount of $23,268.77 and weekly benefits of $9115.07.[1]

### III. The Plaintiff's Suit Against His Coemployees.

Under our Code, workers' compensation benefits are the exclusive remedy against an employer for acts covered by the statute. Iowa Code § 85.20(1). In addition, workers' compensation is the exclusive remedy against

> any other employee of such employer, provided that such injury, occupational disease, or occupational hearing loss arises out of and in the course of such

---

**1.** The defendants do not argue that Nelson has elected his remedies by accepting workers' compensation nor that he has waived a common-law cause of action because of his acceptance of benefits. Accordingly, we do not discuss those issues.

employment, and is not caused by the other employee's *gross negligence amounting to such lack of care as to amount to wanton neglect for the safety of another.*

Iowa Code § 85.20(2) (emphasis added).

The requirements of this statute impose a substantial burden on a plaintiff attempting to sue a coemployee because it requires *wanton* neglect. In the first case decided under this "gross negligence" language, we noted:

> The term "gross negligence" is said to be nebulous, without a generally-accepted meaning: It implies conduct which, while more culpable than ordinary inadvertence or [i]nattention, differs from ordinary negligence only in degree, not kind. However, the legislature added a new dimension and a certain amount of refinement to the term "gross negligence" in section 85.20 by providing it must "amount to *wanton* neglect for the safety of another."
>
> Similar to willful or reckless conduct, "wanton" conduct lies somewhere between the mere unreasonable risk of harm in ordinary negligence and intent to harm.

*Thompson v. Bohlken*, 312 N.W.2d 501, 504 (Iowa 1981) (quoting Iowa Code § 85.20(2)) (other citations omitted).

The key to liability under section 85.20(2) is a showing of "wanton" neglect. We discussed and illustrated the meaning of that term in *Thompson:*

> [A]uthorities distinguish between willfulness, characterized by intent to injure, and wantonness, which merely implies an indifference to whether the act will injure another. The difference is illustrated by comparing the throwing of an object with intent to strike another and throwing it without such intent, but believing that it will, in fact, strike another, and proceeding with indifference as to whether it does not. Wantonness is said to be less blameworthy than an intentional wrong only in that instead of

affirmatively wishing to injure another, the actor is merely willing to do so.

*Id.* at 505 (citations omitted).

In *Thompson* we adopted the following test to establish gross negligence amounting to such lack of care as to amount to wanton neglect under section 85.20(2):

> (1) knowledge of the peril to be apprehended; (2) knowledge that injury is a probable, as opposed to a possible, result of the danger; and (3) a conscious failure to avoid the peril.

*Id.*

■ In applying this test, we view the evidence in the summary judgment record in the light most favorable to the plaintiff. The specific question is whether there is evidence that the defendants knew injury was "a probable, as opposed to a possible," result of their actions and, nevertheless, proceeded with indifference.

A deposition of the plaintiff established that pranks were common at Winnebago. The plaintiff himself had participated in several of them, including lighting a fire to the strings of aprons being worn by coemployees so many times the witness relating these events could not even estimate the number. On the day in question, a coemployee sneaked up behind Nelson and began to tape him. Other employees joined in, and he was taped like a "mummy" with duct tape. The plaintiff testified "my hands and feet were taped. I couldn't move." His feet were "taped together tight" when his coemployee finished taping him. Seven (or possibly eight) men carried him a distance estimated by the plaintiff to be ten to fifteen feet to a shower, where he was dropped. Witnesses other than the plaintiff estimated it could have been as far as thirty feet. He said he did not believe anyone intended to drop him and the whole incident was "a practical joke." Once taped, he did not resist because "[i]t's kind of hard to move when you're taped up."

The issue is whether, given the facts provided in the summary judgment record,

viewed in the light most favorable to the plaintiff, could a reasonable fact finder conclude that injury to the plaintiff was a probable, as opposed to a possible, result. A probable result means a result that probably will occur. "Probably" is defined as that which "seems reasonably . . . to be expected: so far as fairly convincing evidence or indications go." Webster's Third New International Dictionary 1806 (unabr. ed.1986).

We do not believe a reasonable fact finder could conclude that, when a person who was supported by seven or eight full-grown men was carried a distance of only ten to fifteen (or as many as thirty) feet, at a height of only two feet, an injury was probable as opposed to possible. Applying the illustration in *Thompson*, carrying the plaintiff, believing that it would in fact result in injury to him "and proceeding with indifference as to whether it does [or] not" would be wanton conduct. The record in this case cannot reasonably be construed to support such a claim. We conclude the district court properly entered summary judgment in the suit against the coemployees.

We affirm on both issues.

**AFFIRMED.**

All justices concur except LAVORATO, C.J., and CARTER and NEUMAN, JJ., who concur in part and dissent in part.

LAVORATO, Chief Justice (concurring in part; dissenting in part).

I concur as to Division I and dissent as to Division II.

Iowa Code section 85.20 provides that an employee may seek common-law recovery for injuries that arise out of and in the course of employment when they resulted from the gross negligence of coemployees amounting to such lack of care as to amount to wanton neglect for the safety of another.

As the majority notes, three elements are necessary to establish the gross-negli-

gence claim: (1) knowledge of the peril to be apprehended; (2) knowledge that injury is a probable, as opposed to a possible, result of the danger; and (3) a conscious failure to avoid the peril. *Henrich v. Lorenz*, 448 N.W.2d 327, 332 (Iowa 1989). To recover, a plaintiff must establish all three elements by substantial evidence. *Id.* at 333.

The district court concluded there was a jury question as to the first and third elements. The majority does not dispute this conclusion.

However, the district court determined that, while a reasonable jury could conclude that those defendants actually carrying out the prank should have known that an injury to Nelson was possible, a reasonable jury could not conclude on this record that an injury was probable. The majority agrees.

The district court also concluded that, "[b]y binding Nelson's arms with duct tape, the defendants prevented him from protecting himself. Therefore, an injury was possible if he were dropped to the floor." Contrary to the district court and the majority, however, I think there were additional facts that generated a genuine issue of fact on whether the injury was probable.

The majority relies heavily on Nelson's deposition testimony as proof that the injury was not probable. For example, the majority points out that Nelson testified that his hands and feet were taped and he therefore could not resist. Additionally, the majority relies on the fact that seven or eight men carried Nelson a distance estimated by Nelson to be ten to fifteen feet to a shower where he was dropped, striking the floor. The inference the majority makes is that, in all probability, seven or eight men would not drop an individual when that individual is unable to resist and is carried only a short distance.

There are several problems with this reasoning. Considering Nelson's deposition as a whole, one can reasonably con-

clude Nelson had no clear memory of what happened once he was accosted because he probably blacked out after hitting the floor. Most of what he relates is what people told him. More important, Bill D. Lamping, one of the defendants, who has much to lose in this lawsuit, testified in his deposition directly contrary to what Nelson testified.

First, Lamping testified that Nelson was struggling intensely with his captors:

Q. When you say they were struggling with Kim Nelson; is that correct? A. Yes.

Q. Tell me—Can you describe what you saw? A. Well, Kim was fighting like a madman. And these other guys were trying to tape him up.

Q. You say he was fighting like a madman. He was trying to get loose. A. Yes.

Q. All right. A. He was trying to hurt—

Q. Pardon? A. He was trying to hurt some of the other people.

Q. Trying to hurt them? A. Yes, by grabbing their testicles, pinching them, hitting them.

Second, according to Lamping, Nelson's legs were not taped together:

Q. Approximately how long did they take in taping him up completely? A. A few minutes.

. . . .

Q. At the end of that period of time he was then—were his arms taped down to his side? A. Yes, they were.

Q. Were his legs taped together? A. No, they were not.

Q. His arms were incapacitated though, weren't they? A. Yes, they were.

Q. There was no tape on his legs at all? A. No, there was not.

Third, Lamping confirmed that the defendants were having a problem carrying Nelson and that he—Lamping—warned the defendants:

Q. During the taping was he picked up off the ground? A. Yes, he was.

Q. You said you at one point did something with one of his legs? A. I supported it.

Q. Okay. Tell me how that happened. What are you saying? What did you do? A. I'm saying that they were having him at an angle, and I hollered at them to pick him up before they dropped him and hurt him. And they got him up and dropped his leg. And I went under it and stuck my arms under it like this.

. . . .

Q. And why do you say you were supporting him? A. Yes.

Q. I mean, why were you doing that? A. So they wouldn't drop him.

. . . .

Q. [D]id he get one leg loose? A. The way he was fighting, I'd say he probably pulled one loose.

Additionally, according to Lamping, six men carried Nelson, who at the time weighed 220 pounds, while he—Lamping—supported Nelson's legs. The evidence would also support a finding that the defendants carried Nelson twenty to thirty feet to the shower. From the injuries sustained and from Nelson's testimony, a fact finder could reasonably find that Nelson fell on his face. The evidence shows he also sustained injuries to his head, neck, back, and shoulders. The injuries were apparently serious, because Winnebago paid medical benefits totaling $23,268.77.

Viewing this evidence in the light most favorable to Nelson, I think a fact finder could piece together the following scenario. Six men, bent on a mission to carry a fellow employee to a shower some thirty feet away, taped the struggling 220–pound employee around his arms, leaving his legs free with which he could and did struggle. Before reaching the shower, one of the men warned the others to pick up the struggling employee at a better angle be-

fore they dropped him and hurt him. In fact, the men did drop the struggling man face first to the ground, injuring him seriously.

I think at the point of warning, it became evident to all, as a matter of common sense, that unless they ceased in their efforts to carry out the prank, the pranksters would injure the victim by dropping him. Notwithstanding the warning and the obvious danger that injury was a probable consequence of their actions, the pranksters continued in their prank until the obvious became a reality.

In *Alden v. Genie Industries,* two employees were painting light poles using the employer's manlift. 475 N.W.2d 1, 1 (Iowa 1991). The employees' supervisor told them to continue painting even though one of them warned the supervisor it was too windy to use the manlift. *Id.* The manlift collapsed while the two employees were painting the light poles, causing one of them to fall to his death. *Id.* We focused on the *warning* as generating a genuine issue of material fact on whether the supervisor knew that the fall was a probable, as opposed to a possible, result of danger. *Id.* at 3.

Likewise, in *Swanson v. McGraw,* warning played a key role in generating a genuine issue of material fact on this element of a section 85.20 gross negligence case. 447 N.W.2d 541, 545 (Iowa 1989). In *Swanson,* the injured employee was working with a soap that contained highly caustic chemicals such as lye, which could cause severe chemical burns. *Id.* The fact that the employee told his supervisor twice of a tear in his protective suit and the supervisor told him to protect himself the best he could was significant on the probability-of-injury element. *Id.*

Contrary to the majority, I would hold that Nelson generated a genuine issue of material fact on the probability-of-injury element and would therefore reverse and remand for further proceedings on the gross-negligence claim.

CARTER and NEUMAN, JJ., join this concurrence in part and dissent in part.