# In the Iowa Supreme Court

No. 23–0603

Submitted November 14, 2024—Filed May 23, 2025

**Nedzad Mehmedovic** as the administrator of the **Estate of Hus Hari Buljic** and as the administrator of the **Estate of Sedika Buljic; Honario Garcia,** individually and as administrator of the **Estate of Reberiano Leno Garcia;** and **Arturo de Jesus Hernandez** and **Miguel Angel Hernandez** as coadministrators of the **Estate of Jose Ayala,**

Appellants,

vs.

**Tyson Foods Inc., Tyson Fresh Meats Inc., John H. Tyson, Noel W. White, Dean Banks, Stephen R. Stouffer, Tom Brower, Tom Hart, Cody Brustkern, John Casey, Bret Tapken, James Hook, Doug White, Mary Jones,** and **Debra Adams,**

Appellees.

Appeal from the Iowa District Court for Black Hawk County, John J. Sullivan, judge.

Plaintiffs appeal the dismissal of their lawsuit alleging common law claims based on the deaths of four workers after the workers allegedly contracted COVID-19 at work. **Affirmed in Part, Reversed in Part, and Case Remanded.**

McDermott, J., delivered the opinion of the court, in which all justices joined.

G. Bryan Ulmer, III, (argued) and Mel C. Orchard, III, of The Spence Law Firm, LLC, Jackson, Wyoming; Thomas P. Frerichs and Luke D. Guthrie of Frerichs Law Office, P.C., Waterloo; and John J. Rausch of Rausch Law Firm, PLLC, Waterloo, for appellants.

David Yoshimura (argued) and Nicholas Klinefeldt of Faegre Drinker Biddle & Reath LLP, Des Moines, for appellees Hart, Brustkern, Casey, Tapken, and Hook.

Eric B. Wolff (argued) of Perkins Coie LLP, Seattle, Washington; Kevin J. Driscoll and Eric G. Hoch of Finley Law Firm, P.C., Des Moines; and Christopher S. Coleman, Jessica L. Everett-Garcia, Margo R. Casselman, and Samantha J. Burke of Perkins Coie LLP, Phoenix, Arizona, for appellees Tyson Foods Inc., Tyson Fresh Meats Inc., Tyson, White, Banks, Stouffer, Brower, White, Jones, and Adams.

**McDermott, Justice.**

Several estates filed suit against Tyson Foods Inc. and several of its corporate executives and plant supervisors, alleging gross negligence and fraud when four former workers at Tyson Foods's pork processing plant in Waterloo died after contracting COVID-19. The district court concluded that Iowa's Workers' Compensation Act (IWCA) provided the exclusive remedy for the estates' claims and dismissed the case for lack of subject matter jurisdiction. The estates appeal, arguing that their claims fall within an exception in the IWCA and that their claims should proceed.

I.

A.

Because this case involves an appeal from the denial of a motion to dismiss, we accept the facts as alleged in the petition as true. *Meade v. Christie*, 974 N.W.2d 770, 772 (Iowa 2022).

In early January 2020, Chinese state media reported the first known death from a respiratory disease caused by a novel coronavirus that became known as COVID-19. Tyson Foods has extensive meatpacking operations and business interests in China. By February, Tyson's Chinese operation halted some of its plants and reduced or slowed operations at others to stem the spread of COVID-19 and protect workers. Tyson formed a company-wide COVID-19 task force after observing COVID-19's effect on its Chinese operations and workforce.

Tyson's Chinese operation soon implemented several COVID-19 protection polices in its Chinese plants, including providing masks and other appropriate personal protective equipment to employees, using infrared temperature monitors to check employees' temperatures twice a day, installing air filtration systems, establishing quarantine observation areas for workers who were

potentially infected, restricting access to facilities by symptomatic employees, and preventing employees from gathering in cafeterias and breakrooms.

Tyson's largest pork processing plant in the United States was located in Waterloo, employing nearly 3,000 workers and processing close to 20,000 hogs every day. It operated under a wholly owned subsidiary called Tyson Fresh Meats Inc. By March, COVID-19 had made its way to Waterloo. President Trump issued a national emergency declaration, and Governor Reynolds followed with a statewide emergency proclamation. Days after those proclamations, Tyson told its corporate employees to begin working from home. The Waterloo plant remained operating at full capacity.

Days after ordering its corporate employees to work from home, Tyson sent an email to its Waterloo plant workers ordering them to keep coming to work despite what it referred to as "stories about 'shelter in place.['] " When plant workers were symptomatic, they were told that they couldn't go home until they received a positive COVID-19 test. One worker approached his supervisors at the Waterloo plant and said that he was symptomatic and was awaiting a test result. He was told to go back to work. Days later, that test result came back positive. This went against Tyson's flu season policy requiring that symptomatic workers go home.

The plant continued to allow sick workers to stay at work. One worker who vomited on the production line was allowed to continue to work. Another worker who tested positive was told to keep working after the test result came back. One supervisor specifically directed his employees to show up to work even if they were exhibiting COVID-19 symptoms. This supervisor intercepted a worker who was attempting to leave work to get tested and told the worker to get back to work, saying, "[W]e all have symptoms—you have a job to do." The supervisor

also referred to COVID-19 as the "glorified flu," telling his workers not to worry because "everyone is going to get it."

In April, COVID-19 transmission at the plant surged. Supervisors and managers began to avoid the plant floor, delegating their managerial duties to nonmanagerial staff. Supervisors cancelled regularly scheduled safety meetings with workers. Tyson began to log the workers calling in sick with COVID-19 symptoms. (See chart, right.) Although these began to be tracked as "COVID-19 symptoms," Debra Adams, the associate director of occupational health for Tyson Fresh Meats, told Mary Jones, the occupational nurse at the plant, to have the nursing staff change its coding from "COVID-19 symptoms" to "flu-like symptoms." The sick-call log showed a nearly exponential increase in absenteeism among Waterloo plant workers, shown here.

| Waterloo Facility Call Log | |
| --- | --- |
| Date | Calls |
| April 1 | 94 |
| April 2 | 108 |
| April 3 | 113 |
| April 4 | 105 |
| April 6 | 209 |
| April 7 | 193 |
| April 8 | 218 |
| April 9 | 237 |
| April 10 | 294 |
| April 11 | 211 |
| April 13 | 569 |
| April 14 | 445 |
| April 15 | 468 |
| April 16 | 500 |
| April 17 | 549 |
| April 18 | 435 |
| April 20 | 656 |
| April 21 | 567 |
| April 22 | 257 |

The rising absenteeism was becoming apparent to the workers. Around this time, supervisors gathered the plant's interpreters in a closed-door meeting. Most of the workers, including the ones represented by the estates in this case, did not speak English. In this meeting, supervisors told the interpreters to reassure the plant's workers that there was no outbreak, that the county health department "cleared" the plant of COVID-19, and that there had not been any confirmed cases. The supervisors also told the interpreters that they couldn't discuss COVID-19 with the workers further. After this meeting, the supervisors

removed most of the interpreters from the plant floor. The supervisors held two other closed-door meetings after this, when more confirmed cases arose and the county health department became involved.

On April 6, Tyson closed its Columbus Junction processing plant after twenty-nine employees tested positive the day before. The company suspended Columbus Junction's operations indefinitely and moved the plant's hogs to Waterloo for processing. Tyson also had its subcontractors from the Columbus Junction plant—janitors and cafeteria workers—travel to Waterloo to work while Columbus Junction remained closed. These subcontractors were not tested for COVID-19 before starting at the Waterloo plant.

On that same day, Tyson installed stations at the Waterloo plant to check workers' temperatures before entering the building. But the screenings failed to exclude individuals who were taking fever-reducing medications. What's more, the thermometers were not calibrated correctly, resulting in obviously inaccurate results. Supervisors gave workers torn rags and fabric as optional facemasks.

Around this time, the plant's operations garnered the attention of local officials. The county health department attempted to work with the plant, but Tyson, its executives, and its supervisors refused to cooperate. Eventually, on April 10, health department officials and the sheriff were allowed inside the plant. They were shocked. The plant was operating at full speed, with a crowded floor and no personal protective equipment. These officials asked Tyson to close the plant, but Tyson refused.

Two days later, nearly two dozen plant floor workers were admitted to the emergency room with COVID-19 symptoms. Among them was Isidro Fernandez, who died fifteen days later. The day after Isidro Fernandez was admitted to the hospital, so was Jose Ayala, another plant floor employee. In Ayala's medical

records, doctors noted that he worked at Tyson, "where numerous cases of COVID have been confirmed recently." Ayala died from COVID-19 complications about a month later.

Shortly after Fernandez and Ayala were admitted to the hospital, local officials asked Tyson to suspend the plant's operations. Tyson refused for a second time. On April 16, on a day when 500 employees called in sick, Tyson publicly denied that its Waterloo facility had a COVID-19 outbreak. The next day, elected officials got involved. Twenty officials sent Tyson a letter asking it to close the plant and informing it that they'd been made aware that Tyson wasn't distributing personal protective equipment, workers from shuttered Columbus Junction were being transferred to the Waterloo facility, social distancing was not enforced, and because of language barriers, the workers didn't understand that they couldn't come to work if they were sick. Tyson refused to close the plant for a third time.

The next day, another worker, Sedika Buljic, died from COVID-19 complications. Around the same time, another worker at the plant, Reberiano Garcia, was admitted to the hospital with COVID-19. He died about a month later.

Because of Tyson's refusal to close the plant, Iowa lawmakers filed an official complaint with the Occupational Safety and Health Administration (OSHA) against Tyson. Governor Reynolds held a conference call with several Tyson executives the next day, where Tyson officials downplayed the seriousness of the outbreak at the Waterloo plant and exaggerated the efficacy of its safety measures. After the call, Tyson announced internally that it would begin to wind down its operations because it lacked a healthy labor force. The company announced the shutdown publicly the next day, yet it kept the plant open for

three more days to process the remaining hogs. It was not until two days before the plant closed that Tyson began requiring plant floor workers to comply with standard COVID-19 guidelines, such as wearing a facemask.

Around the time Tyson announced the Waterloo plant's closure, the plant manager (one of the supervisor defendants) organized a betting pool. Those partaking could place wagers on how many employees would test positive for COVID-19 over the coming months.

By the time the plant's shutdown was announced, Tyson executives began a public relations campaign. One of the executives (named as a defendant here) gave multiple interviews stating that the majority of the plants didn't have any COVID-19 cases and that the plants with the most cases were likely due to transmissions within the community more broadly.

When the dust settled, the Waterloo plant was the largest reported workplace outbreak in the country. Over 1,000 employees had tested positive, and at least five employees died. Because Tyson was not following the contact tracing program required by the Centers for Disease Control, many family members and community members were unaware that they were exposed to COVID-19 by a Tyson employee. The director of the Black Hawk County Health Department attributed ninety percent of the county's total COVID-19 cases to the Waterloo facility.

## B.

The estates of three deceased workers—Buljic, Garcia, and Ayala—filed suit in June 2020. The estate of a fourth deceased worker from the Waterloo plant—Fernandez—joined the lawsuit about a month later. All four estates bring the same claims against the same defendants and raise the same arguments.

The lawsuit names fourteen defendants. The defendants can be broadly classified into three groups:

- **Corporate defendants:** Tyson Foods Inc. and Tyson Fresh Meats Inc.

- **Executive defendants:** John Tyson (chairman of Tyson Foods), Noel White (CEO of Tyson Foods), Dean Banks (president of Tyson Foods), Stephen Stouffer (president of Tyson Fresh Meats), Tom Brower (senior vice-president of health and safety), Doug White (corporate safety manager of Tyson Fresh Meats), and Debra Adams (associate director of occupational health of Tyson Fresh Meats).

- **Supervisor defendants:** Tom Hart (Waterloo plant manager), James Hook (human resources director), Cody Brustkern (manager), John Casey (manager), and Mary Jones (occupational nurse).

The estates allege causes of action (1) for fraudulent misrepresentation and vicarious liability against the corporate defendants, (2) for gross negligence against the executive defendants, (3) for gross negligence and fraudulent misrepresentation against the supervisor defendants, and (4) for gross negligence and breach of duty against Adams and Jones, specifically. The estates also seek punitive damages against all defendants.

After the estates filed the lawsuits, the defendants removed the suits to the United States District Court for the Northern District of Iowa. The federal district court ultimately ordered that the case be remanded to the Iowa state district court. *Fernandez v. Tyson Foods, Inc.*, 509 F. Supp. 3d 1064, 1084 (N.D. Iowa 2020); *Buljic v. Tyson Foods, Inc.*, No. 20–CV–2055–LRR, 2020 WL 13042580, at *16 (N.D. Iowa Dec. 28, 2020). The defendants appealed the remand order to the Eighth Circuit. The Eighth Circuit affirmed the decision,

and the United States Supreme Court denied certiorari. *Buljic v. Tyson Foods, Inc.*, 22 F.4th 730, 742 (8th Cir. 2021), *cert. denied*, 143 S. Ct. 773 (2023) (mem.).

When the case returned to the district court, the defendants moved to dismiss the petition. The district court granted the motion as to all defendants.

On the gross negligence claims against the executive and supervisor defendants, the district court concluded that the IWCA provided the exclusive means of recovery for the workers' deaths and that the petition failed to establish a right to pursue claims under the statute's carveout for gross negligence claims. The district court reasoned that each coemployee's gross negligence needed to be specifically set forth in the petition such that each coemployee had actual, not constructive, knowledge of the peril or that injury would likely result. The district court also concluded that the petition improperly "lumped" the defendants together by referring to them in categories without specifying "what duty or claim each defendant is alleged to have owed to each Plaintiff."

The district court also dismissed the fraudulent misrepresentation claims against the corporate and supervisor defendants. According to the district court, "the gist of [the estates'] claims is that each decedent was infected in the workplace with COVID-19, that they died as a result of the infection, and that each suffered a workplace injury." The fraud claims, in the district court's view, were effectively gross negligence claims repackaged under a different label. As a result, the fraud claims, too, were preempted by the IWCA's exclusivity provisions.

Because the district court concluded that it lacked subject matter jurisdiction based on the IWCA's exclusivity provisions, it didn't reach any of the defendants' other arguments, including whether the defendants had immunity from the estates' claims under Iowa Code § 686D.4 (2021), the "COVID-19

Response and Back-to-Business Limited Liability Act." The estates filed a motion to enlarge the district court's ruling under Iowa Rule of Civil Procedure 1.904(2) and to further amend the petition. The district court denied the motion. This appeal followed.

II.

A.

The estates argue that the district court erred in its conclusions that (1) the petition's allegations were insufficient to satisfy the gross-negligence exception in the IWCA and (2) that the petition failed to provide notice to all defendants of the claims against them.

Iowa's workers' compensation system "rests on the policy judgment 'that the disability of a work[er] resulting from an injury arising out of and in the course of his [or her] employment is a loss that should be borne by the industry itself . . . and not suffered alone by the work[er] or the employer.'" *Loew v. Menard, Inc.*, 2 N.W.3d 880, 883 (Iowa 2024) (alterations and omission in original) (quoting *Baker v. Bridgestone/Firestone*, 872 N.W.2d 672, 676 (Iowa 2015)). Workers surrender their right to sue their employer for damages on the condition that regardless of fault, the employer promptly compensates workers for injuries that arise out of and in the course of employment. *Tripp v. Scott Emergency Commc'n Ctr.*, 977 N.W.2d 459, 464 (Iowa 2022).

Iowa Code § 85.20 makes the workers' compensation system the exclusive path for recovery against employers and coemployees for most work-related injuries, stating:

> The rights and remedies provided in this chapter, chapter 85A, or chapter 85B for an employee, or a student participating in a work-based learning opportunity as provided in section 85.61, on account of injury, occupational disease, or occupational hearing loss for which benefits under this chapter, chapter 85A, or chapter 85B

are recoverable, shall be the exclusive and only rights and remedies of the employee or student, the employee's or student's personal or legal representatives, dependents, or next of kin, at common law or otherwise, on account of such injury, occupational disease, or occupational hearing loss against any of the following:

1. Against the employee's employer.

2. Against any other employee of such employer, provided that such injury [or] occupational disease . . . arises out of and in the course of such employment and is not caused by the other employee's gross negligence amounting to such lack of care as to amount to wanton neglect for the safety of another.

Iowa Code § 85.20(1)–(2) (2020).

The district court concluded that because the petition "lumped" the defendants into categories in setting forth the allegations, the allegations failed to "give sufficient notice as to what duty or claim each defendant is alleged to have owed to each Plaintiff" and failed to plead how each coemployee "had actual knowledge of the peril to be apprehended or that injury is a probable result of the danger" to bring the gross-negligence exception into play. The district court concluded that these pleading deficiencies left it without subject matter jurisdiction in this case.

The district court's ruling somewhat blurs the conceptual differences between subject matter jurisdiction and a plaintiff's failure to sufficiently plead its allegations. With subject matter jurisdiction, a court's concern is whether the case before it, as a general class of cases, falls under its inherent power to decide the case and provide the type of relief sought. *De Stefano v. Apts. Downtown, Inc.*, 879 N.W.2d 155, 164 (Iowa 2016). Whether a petition has sufficiently pleaded allegations, on the other hand, centers around fair notice. *Schmidt v. Wilkinson*, 340 N.W.2d 282, 283 (Iowa 1983); *see* Iowa R. Civ. P. 1.421(1)(*f*). Although related, these are two different questions. "Subject matter jurisdiction," we have

said, "is not dependent on whether the petition has established a meritorious claim." *Powell v. Khodari-Intergreen Co.,* 303 N.W.2d 171, 174 (Iowa 1981).

We start with whether the petition provided sufficient notice. Under our ordinary notice pleading standards, a plaintiff's petition survives a motion to dismiss if it simply contains factual allegations that give the defendant "fair notice" of the claim so the defendant can adequately respond to the petition. *Schmidt,* 340 N.W.2d at 283; *see* Iowa R. Civ. P. 1.421(1)(*f*). A petition meets the fair notice requirement if it informs the defendant of the events that give rise to the claim and of the claim's general nature. *Soike v. Evan Matthews & Co.,* 302 N.W.2d 841, 842 (Iowa 1981).

In our view, the petition's groupings provided each defendant with fair notice of the claims against them. Plaintiffs are not forbidden from defining and referring to a group of defendants collectively under a particular moniker for ease of reference in a petition. *See Kyle K. v. Chapman,* 208 F.3d 940, 944 (11th Cir. 2000) ("The fact that defendants are accused collectively does not render the complaint deficient."). Indeed, we note that even the defendants referred to themselves as "supervisory defendants" and "executive defendants" at the motion to dismiss hearing. The petition contains sufficient facts to inform each defendant of the events giving rise to the claim and the claim's general nature in compliance with our rules of civil procedure.

Turning to subject matter jurisdiction. Iowa's district courts have "exclusive, general, and original jurisdiction of all actions . . . except in cases where exclusive or concurrent jurisdiction is conferred upon some other court, tribunal, or administrative body." Iowa Code § 602.6101. In the IWCA, the legislature conferred original jurisdiction on an administrative body (i.e., the workers' compensation commissioner) to hear and decide cases involving

workplace injuries. *See id.* § 85.3(2). Except in cases involving a coemployee's gross negligence; there, district courts maintain their jurisdiction. *Id.* § 85.20(2); *Taylor v. Peck*, 382 N.W.2d 123, 126 (Iowa 1986). Thus, whether subject matter jurisdiction exists over the common law tort claims against the executive and supervisor defendants turns on whether the estates have pleaded facts sufficient to meet the gross negligence exception.

The defendants assert that the pleading standard to meet this exception is high, and that the plaintiffs failed to meet it. Although gross negligence under § 85.20(2) presents a high *evidentiary* burden for plaintiffs to meet, *Johnson v. Interstate Power Co.*, 481 N.W.2d 310, 321 (Iowa 1992) (en banc), the sufficiency of a pleading alleging gross negligence is still subject to our ordinary notice pleading standard. We may dismiss a claim "only if the petition shows no right of recovery under any state of the facts." *Southard v. Visa U.S.A. Inc.*, 734 N.W.2d 192, 194 (Iowa 2007) (quoting *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 442 (Iowa 2002)).

To show gross negligence under § 85.20(2), a plaintiff must establish three elements: "(1) knowledge of the peril to be apprehended; (2) knowledge that injury is a probable, as opposed to a possible, result of the danger; and (3) a conscious failure to avoid the peril." *Thompson v. Bohlkem*, 312 N.W.2d 501, 505 (Iowa 1981) (en banc).

Under the first element, we have said that knowledge of the peril requires that the defendant "actually knew" of the peril or hazard. *Walker v. Mlakar*, 489 N.W.2d 401, 404 (Iowa 1992) (en banc). Constructive knowledge of the peril is insufficient to establish gross negligence. *Id.* Knowledge of the peril does not mean a person must know that a specific injury will occur, but instead only that a condition is dangerous enough that it could produce an injury. *Id.*

As to the executive defendants, the petition includes many allegations showing that they were aware of the COVID-19 outbreak at the Waterloo plant. Among other allegations, the petition charges that the executive defendants "were regularly briefed on positive COVID-19 cases at Tyson Foods facilities and the number of Waterloo Facility employees with symptoms of COVID-19, and they learned that the virus had been detected at the Waterloo Facility within days of the first confirmed case." The petition describes in multiple places the lethal risks that the virus poses to humans and the high risk of transmission between people working in close proximity to one another. The estates, in our view, have alleged sufficient facts to show that the executive defendants had knowledge of the peril.

As to the supervisor defendants, the petition similarly makes many allegations asserting they, too, had knowledge of the peril. Among other allegations, the petition states that the supervisor defendants were aware that the representations of the plant being clear of COVID-19 were false and that the supervisors themselves began to avoid the plant floor because of the outbreak. The petition also recites supervisors' statements to interpreters directing them to mislead workers about the dangers of the virus and its spread within the plant. We conclude that the estates have likewise alleged sufficient facts to show that the supervisor defendants had knowledge of the peril.

Turning to the second element—that the defendants had knowledge that the injury was a probable, and not just a possible, result of the danger—the estates recite the petition's allegations about the executive and supervisor defendants' knowledge of the danger. The petition alleges that the executive and supervisor defendants knew that the virus had a high rate of transmission between people working within close proximity of one another. The estates allege

that these defendants knew that injury was probable because hundreds of employees were calling in sick with COVID-19 symptoms—a statistic the defendants tracked and recorded in daily logs. The petition alleges that these defendants knew that the probability of transmission—and thus the resulting probability of injury—was high. In response to the risk, the estates recite that the defendants instituted (even if inadequately) temperature readings at the plant and provided materials for employees to use for face masks. The estates also point to the alleged betting pool among supervisors and managers at the plant about how many employees would test positive for the virus. Finally, the estates point to the allegation that supervisor defendants took special steps to protect *themselves* from transmission by, among other things, refusing to venture onto the plant's floor. In our view, the petition sufficiently alleges that the executive and supervisor defendants knew the injury was a probable, and not just a possible, result of the danger.

As to the third element—that the defendants showed a conscious failure to avoid the peril—the estates point to the petition's allegation that the supervisor defendants disregarded the danger by cancelling regularly scheduled safety meetings and directing supervisors and interpreters to falsely deny that the virus had been detected in the plant. They further recite the false claim that the county health department had "cleared" the plant of the virus. The estates also point to allegations that the executive and supervisor defendants permitted—indeed, required—employees with symptoms to continue working in close proximity to other employees. This requirement to keep working included symptomatic employees who had been tested and were merely awaiting test results. The petition also describes how executive defendants, despite closing the company's Columbus Junction plant because of the virus's outbreak there, kept the

Waterloo plant operating at full capacity without protective measures in place. Finally, they point to the allegation that executive defendants ordered two supervisors to stop tracking COVID-19 cases among the workers. Once again, as a matter of pleading sufficiency, we conclude that the petition adequately asserts that the defendants showed a conscious failure to avoid the peril.

In ruling on a motion to dismiss, the court accepts the facts alleged in the petition as true, *McGill v. Fish*, 790 N.W.2d 113, 116 (Iowa 2010), and views the allegations in the light most favorable to the plaintiff, *Haupt v. Miller*, 514 N.W.2d 905, 911 (Iowa 1994) (en banc). At this stage of the proceedings—on review of a motion to dismiss—we assume the truth of the factual allegations in the petition and make no determination about the strength of the estates' evidence to support those allegations. Our focus is whether the estates have sufficiently pleaded a cause of action for gross negligence under § 85.20(2). We conclude they have. We thus hold that the district court erred in dismissing the estates' gross negligence claims against the executive and supervisor defendants.

B.

The estates further argue that the district court erroneously dismissed their fraudulent misrepresentation claims against the corporate and supervisor defendants. The district court concluded that the fraud claim was, in effect, merely a restyled version of the estates' gross negligence claim and thus likewise barred under the IWCA's exclusivity provisions.

Fraudulent misrepresentation is an "intentional" tort, meaning that it is committed by a party acting with a mental state intending to commit the act in question. The elements of a fraud claim include, among other things, proof that the defendant intended to deceive the plaintiff. *Dier v. Peters*, 815 N.W.2d 1, 7 (Iowa 2012).

As a general matter, the IWCA's exclusivity provisions do not apply to intentional tort claims against coemployees. *See, e.g., Smith v. Iowa State Univ. of Sci. & Tech.*, 851 N.W.2d 1, 20 (Iowa 2014) (holding that a claim for intentional infliction of emotional distress was not preempted under the IWCA); *Wilson v. IBP, Inc.*, 558 N.W.2d 132, 137 (Iowa 1996) (en banc) (holding that "claims for breach of fiduciary duty and defamation, as intentional torts, fall outside the scope of the remedies available under the workers' compensation act" and thus were not preempted); *see also Beard v. Flying J, Inc.*, 266 F.3d 792, 803 (8th Cir. 2001) (recognizing that under Iowa law, "intentional torts committed by co-workers remained actionable despite the workers' compensation system" and thus holding that a battery claim was not preempted). An intentional tort fits within—indeed, goes beyond—the gross-negligence exception in § 85.20(2) as "amounting to such lack of care as to amount to wanton neglect for the safety of another." Stated simply, if wanton neglect for a coworkers' safety takes an action outside the statute, then logically an *intentional act* by a coemployee that injures a worker should fall outside the statute too. Consistent with our prior cases, we conclude that the district court had subject matter jurisdiction of the common law fraud claims alleged against the supervisor employees.

But the corporate defendants raise a separate argument: Tyson Foods and Tyson Fresh Meats were the entities alleged to have employed the deceased workers; they are not coemployees. The corporate defendants argue that the exception in § 85.20(2) for gross negligence applies only to coemployees and not to employers, and thus the intentional tort claims against them were properly dismissed.

In response, the estates argue that in *Nelson v. Winnebago Industries, Inc.*, 619 N.W.2d 385 (Iowa 2000) (en banc), we recognized a right for an injured

employee to bring an intentional tort claim against an employer notwithstanding the IWCA's exclusivity provisions. In *Nelson*, we discussed the general rule that an employer is not liable for a coemployee's intentional torts. *Id.* at 387–88. This rule is based on the idea that when coemployees, on their own, intentionally injure one of their coworkers, the *employer* can't be said to have acted intentionally in causing the injury, so the injury as to the employer must be treated as covered under the workers' compensation system. *Id.*

But we went on to discuss two scenarios when that justification might fall away. *Id.* The first is when a coemployee is the actual employer or the employer's alter ego, since in that case the employer itself effectively performs the intentionally tortious act. *Id.* at 387. The second is when the employer has commanded or expressly authorized a coemployee to commit the intentional tort. *Id.* at 387–88. In *Nelson*, the plaintiff did not allege that either scenario applied in his case, and we thus held that the plaintiff's injury as it related to the employer was subject to the IWCA. *Id.* The estates in this case argue that the second scenario is in play here: that the corporate entities commanded or expressly authorized the alleged fraud perpetrated against the decedent workers.

As the corporate defendants point out, the problem with the estates' arguments—and perhaps more accurately, the problem with our discussion in *Nelson* that the estates advance—is that it directly conflicts with the text of the statute. Again, § 85.20 makes the workers' compensation system "the exclusive and only rights and remedies" for work injuries (1) "[a]gainst the employee's employer" and (2) "[a]gainst any other employee of such employer, . . . provided that such injury . . . is not caused by the other employee's gross negligence." Iowa Code § 85.20(1)–(2). The gross-negligence exception to the Act's exclusivity appears only in subsection (2)'s reference to coemployees, not in

subsection (1)'s reference to employers. This suggests that any claim for a work-related injury against an employer, regardless of the type of claim, finds its remedy only through the workers' compensation system.

"Iowa's workers' compensation system is a creature of statute, being both conceived and constructed by legislative action." *Tripp*, 977 N.W.2d at 464. Where the legislature by statute confers original jurisdiction not with the district court but "upon some other . . . administrative body"—as it has with the IWCA—we lack subject matter jurisdiction. Iowa Code § 602.6101. Although our discussion in *Nelson* has been mentioned in other cases, the estates cite no case, and we are aware of none, where we have permitted a plaintiff to pursue an intentional tort claim for work-related injuries against an employer. Under a straightforward reading of the text, employees whose injuries are covered under workers' compensation have no right to pursue direct tort claims (whether based on gross negligence, intentional torts, or otherwise) to recover for those injuries against their employers.

Our discussion in *Nelson* is at odds with the statutory text and, as a result, at odds with our power to exercise subject matter jurisdiction to adjudicate such a claim against an employer. We thus recant our discussion in *Nelson* suggesting that intentional tort claims against an employer for a work-related injury fall outside the scope of the IWCA. Because the district court lacked subject matter jurisdiction over the tort claims alleged against the corporate defendants, we affirm the district court's dismissal of Tyson Foods and Tyson Fresh Meats from this case.

C.

Adams and Jones argue that the estates waived any objection to the district court's dismissal of the estates' "breach of duty" claims against them.

Issues decided in the district court but not raised on appeal are waived. *Morris v. Steffes Grp., Inc.*, 924 N.W.2d 491, 498 (Iowa 2019). The estates never contested the dismissal of the breach-of-duty claims in their opening brief, reply brief, or at oral argument. We thus affirm the district court's dismissal of the breach-of-duty claims against Adams and Jones.

D.

An appellate court may affirm a district court ruling on any ground urged by the successful party in the district court and again on appeal, even if the district court didn't rely on that ground in its ruling. *Veatch v. City of Waverly*, 858 N.W.2d 1, 7 (Iowa 2015). The defendants argued in the alternative in the district court, and argue again on appeal, that the estates' lawsuit is barred under Iowa Code § 686D.4, the "COVID-19 Response and Back-to-Business Limited Liability Act."

The Back-to-Business Act provides liability protections in defined circumstances for injuries based on exposure to COVID-19. As relevant here, the Back-to-Business Act provides that

> [a] person who possesses or is in control of a premises . . . who directly or indirectly invites or permits an individual onto a premises, shall not be liable for civil damages for any injuries sustained from the individual's exposure to COVID-19, whether the exposure occurs on the premises or during any activity managed by the person who possesses or is in control of a premises.

Iowa Code § 686D.4 (2021).

But this liability provision contains three exceptions. The liability protections do not apply if the person possessing or in control of the premises (1) "recklessly disregards a substantial and unnecessary risk that the individual would be exposed to COVID-19," (2) "exposes the individual to COVID-19

through an act that constitutes actual malice," or (3) "intentionally exposes the individual to COVID-19." *Id.* § 686D.4(1)–(3).

The estates contest whether the defendants' Back-to-Business Act argument has been preserved on appeal, whether the Act applies to all defendants or only the corporate defendants, and whether the Act applies retrospectively to the estates' claims. They further argue that the petition's allegations fall within the Act's exceptions to the liability protections. The defendants, in response, reject all the estates' challenges to the Act's application, and they argue that the petition fails to sufficiently plead any of the three exceptions to avoid the statute's protections. Assuming, without deciding, that the protections in the Act apply in this case, we turn to whether the petition presents a claim that falls within one of its exceptions.

The first exception states that a person otherwise covered by the Act loses protection if the person "recklessly disregards a substantial and unnecessary risk that the individual would be exposed to COVID-19." *Id.* § 686D.4(1). Citing a definition for "recklessness" under Iowa's repealed automobile guest statute, the defendants contend that "reckless disregards" requires proof that a party manifested "no care." *Nesci v. Willey*, 75 N.W.2d 257, 259 (Iowa 1956). They argue that the petition's own reference to protective measures that the defendants took—for instance, conducting temperature readings, providing face coverings, and requiring employees who tested positive to quarantine for fourteen days—affirmatively establishes that the defendants did *not* exercise a "reckless disregard" for COVID-19-related risks in operating the plant.

In response, the estates propose that we follow the Restatement (Second) of Tort's definition of "reckless disregard." The Restatement defines "reckless disregard of safety" as when (1) someone performs or fails to perform a duty,

(2) they know or have reason to know facts that would cause a reasonable person to realize that there is "an unreasonable risk of physical harm to another," and (3) that "risk [of harm] is substantially greater than that which is necessary to make [the] conduct negligent." Restatement (Second) of Torts § 500, at 587 (Am. L. Inst. 1965).

We have often used this definition from the Restatement (Second). *See, e.g.*, *Meyer ex rel. Leonard v. Behrens*, 601 N.W.2d 76, 80 (Iowa 1999) (per curiam) (quoting the Restatement (Second)'s definition and discussing various contexts in which we have generally applied it). What's more, the Back-to-Business Act's language—"substantial and unnecessary risk"—aligns with the Restatement (Second) § 500's requirement that the risk be "substantially greater than that which is necessary to make [the] conduct negligent." *Compare* Restatement (Second) of Torts § 500, at 587, *with* Iowa Code § 686D.4(1). We see no reason to stray from the Restatement (Second)'s definition in construing the Back-to-Business Act's first exception.

The petition, in our view, alleges sufficient facts to meet § 686D.4(1)'s exception that the executive and supervisor defendants "recklessly disregard[ed] a substantial and unnecessary risk that the individual would be exposed to COVID-19." As a result, we need not consider sufficiency of the pleadings under either of the other two exceptions in § 686D.4. Because the estates have sufficiently pleaded an exception to the Back-to-Business Act, we may not affirm the dismissal on this alternative ground.

III.

We thus affirm the district court's order dismissing all claims against the corporate defendants and the breach-of-duty claims against Adams and Jones,

but we reverse the district court's dismissal of the claims against the executive and supervisor defendants.

**Affirmed in Part, Reversed in Part, and Case Remanded.**